[No. A024331. First Dist., Div. Two. May 21, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JON LAURENCE COAD, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

David C. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eugene W. Kaster and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SMITH, J.**—Jon Laurence Coad appeals from a judgment entered after he was convicted by a jury of possession of a concealable firearm by a felon

(Pen. Code, § 12021),[1] assault with a deadly weapon (§ 245, subd. (a)(1)), vandalism resulting in less than $1,000 damage (§ 594, subd. (b)(2)), and misdemeanor battery of a police officer (§§ 242, 243, subd. (b)). The jury also found that the assault with a deadly weapon was committed while appellant was free on bail pending trial on a felony charge (§ 12022.1) and that appellant had been convicted of a prior serious felony (voluntary manslaughter) within the meaning of section 667. We modify the judgment and, as so modified, affirm.[2]

## BACKGROUND

The four convictions arose out of three separate incidents which occurred over a period of eight months.

### Possession of a concealable firearm

The conviction for violating section 12021 arose out of an incident which occurred on April 3, 1982.[3] At 11 p.m. on that date, Albert Negovan, an employee of the City of San Jose, was performing some job related tasks at a pump station in Alviso during a period of severe flooding in that area. As he was working outside the pump station, Negovan saw appellant drive up in a grader and stop about 20 feet from where Negovan was standing. Negovan then saw appellant step down from the grader and approach a group of five or six "Mexicans" who were standing nearby drinking beer around a pickup truck. Although Negovan could not hear what was said, appellant and the Mexicans began speaking in loud voices and apparently became embroiled in a dispute. A woman who was also riding on the grader then approached Negovan and told him appellant had a gun. Mr. Negovan walked over to where appellant was talking with the Mexicans; he saw that appellant was holding a revolver in his right hand with the barrel facing down. With the help of another bystander, Negovan managed to break up the dispute and appellant got back on the grader and drove away. In the meantime, however, another bystander had called the police to tell them a man was threatening others with a gun.

San Jose Police Officer Terrence Simpson was patrolling with his partner in the Alviso area when he received a radio report that a man in a grader was threatening others with a gun in the vicinity of Gold and Moffit Streets in Alviso. As Simpson approached that intersection, he was flagged down

---

[1]Unless otherwise noted, subsequent statutory references are to the Penal Code.

[2]See footnote, *ante,* page 1094.

[3]Appellant had been convicted in 1980 of voluntary manslaughter and was thus prohibited from possessing or having under his control "any pistol, revolver, or other firearm capable of being concealed upon the person . . . ." (§ 12021, subd. (a).)

by a man who related the incident involving appellant and the Mexicans. Simpson and his partner then proceeded down Gold Street until they encountered and stopped the grader driven by appellant. Simpson ordered appellant to get down from the grader, and then conducted a pat down search for weapons. When the officer told appellant he matched the description of a man who had reportedly used a gun to threaten a group of Mexicans, appellant said he didn't know what the officer was talking about. The officer then climbed into the cab of the grader and found a loaded revolver in a depression next to the driver's seat. The officer also found a .22 caliber AR-7 rifle which was broken down with the barrel disconnected and stored in the stock. Appellant was subsequently placed under arrest and booked.

Appellant took the stand and testified that on the night of the incident he was using the grader to tow cars trapped in the flooding and to haul sandbags to a site where a levee had broken. One of the people who was working at the levee was Santa Clara Deputy Sheriff Rod Herlitz. Initially, Herlitz was wearing his service revolver while he worked on the levee; eventually, however, the revolver became uncomfortable, so he removed the gun, placed it in the grader next to the driver's seat and covered it with his raincoat. Appellant did not see Herlitz put the gun in the grader, and Herlitz did not tell appellant that he had done so.

After the group had finished sandbagging for the night, appellant drove toward home in the grader with his girlfriend Tina as a passenger. On the way home, they drove by a group of Latinos who had earlier threatened to forcibly take some sandbags appellant was transporting to the levee site. As appellant stopped the grader to change gears, the group began yelling at him, threatened to "do things" to his girlfriend, and said they were going to shoot him. Appellant, who, as will become apparent, is not a man to back away from a confrontation, reached down next to the driver's seat and grabbed what he thought was a pipe or wrench, but was in fact Deputy Herlitz's service revolver. Appellant told Tina to get some help and got down from the grader to confront the group. Appellant claims he did not realize he was holding a gun until he was climbing down from the motor grader. Once on the ground, appellant did not point the gun at anybody, but held it pointing toward the ground. Once the bystanders intervened and the confrontation cooled down, appellant got back into the grader, returned the gun to the cubbyhole next to his seat, and drove toward home until he was stopped by the police. Appellant admitted that he lied to the officers when he denied having a gun; he did so, he said, because he was a felon and knew it was illegal for him to possess a concealable weapon.

The thrust of appellant's defense to this charge was self-defense—he claimed that he had a reasonable belief that the group of Latinos was about

to inflict bodily injury upon him and that he had a right to use reasonable force (including exhibiting a weapon) to protect himself and his girlfriend.

*Vandalism and misdemeanor battery*

The convictions for vandalism and misdemeanor battery arose out of an incident which occurred on September 8, 1982. On that date appellant argued with his then girlfriend (later wife) Tina and ended up following her as she drove to a fire station located in Alviso. Fireman Donald Tyson was standing outside the station when Tina drove up in a blue van followed closely by appellant in a pickup truck. Tina appeared very excited and was screaming. Appellant got out of his truck, walked over to the van and began pounding on it while Tina was inside. Tyson tried to intercede, but appellant, who is 6 feet 4 inches tall and weighed between 218 and 240 pounds at the time, began threatening Tyson and chased him, along with 2 other firemen, back into the firehouse. The captain of the firehouse called the police. After a few minutes, appellant drove away in the pickup truck, and the firemen brought Tina into the firehouse. Appellant returned shortly thereafter on foot, and attempted to set the van on fire by ripping out the fuel lines and igniting the fuel with matches. After this attempt failed, he yelled insults at the firemen in the station house and accused them of engaging in sex with Tina. After a few minutes appellant again left.

Shortly thereafter, two policemen arrived on the scene, and the firemen told them what had happened. As the police officers were questioning Tina, appellant again returned to the fire station, this time astride a very large bulldozer. Tyson heard appellant clanking up the street and alerted the police officers who stepped outside and yelled at appellant to stop. Appellant paid no heed, and the officers trained a shotgun and pistol on appellant and again demanded that he stop; appellant ignored the demand and continued to drive the bulldozer over a tree and a wooden fence, knocking both down. The officers then ran along the side of the bulldozer, which was moving at less than five miles per hour, and yelled at appellant to stop. While the officers had their weapons trained on appellant, he stood up several times and shouted "Shoot me! Shoot me!" Eventually, appellant started driving toward an area where some children were playing; fearful that appellant would harm the children, the officer armed with a shotgun pumped three rounds into the tractor's engine, bringing it to a halt.

Appellant then stood up on the tractor and once again yelled at the officers to kill him; when they did not comply, appellant jumped down from the tractor. He then charged one of the officers, grabbed him, lifted him bodily, and slammed him to the ground. The other officer came to the first officer's

assistance, and, after a violent struggle, they managed to subdue and handcuff appellant.

Appellant presented no real defense to the vandalism and misdemeanor assault charges. He said only that he had been very depressed, had earlier attempted suicide, and had decided that he would indirectly kill himself by threatening the police officers with the bulldozer until they shot him. In his closing argument defense counsel essentially conceded that appellant was guilty of vandalism and misdemeanor battery of a police officer. However, appellant did successfully defend against and was acquitted of charges that he had stolen the bulldozer (Veh. Code, § 10851) and had committed an assault with a deadly weapon—namely, the bulldozer.

### Assault with a deadly weapon

The conviction for assault with a deadly weapon arose out of an incident at a New Year's Eve party celebrating the beginning of 1983. Appellant became angry at another guest and threw a chair at him. Martin Aalso, also a guest at the party, then approached appellant from behind, put his hand on appellant's arm and started to tell appellant not to break the furniture. Appellant immediately spun around and punched Aalso in the mouth. A group of guests then restrained appellant, and Aalso retaliated by punching appellant in the face until he, too, was restrained by other guests.

The party started to break up shortly thereafter, and Aalso went outside to the parking lot with his girlfriend Joyce. They got into their Volkswagen and were driving out of the parking lot when appellant ran in front of the car and forced Aalso, who was driving, to stop the car. Appellant then began banging on the top of the car with a large knife, and yelled "Don't fuck with me. I'll kill you." As appellant was banging on the car and yelling, Joyce, who was sitting in the passenger seat, watched as a knife blade pierced through the roof of the car and extended four inches into the car's interior. Joyce testified that when the knife blade entered the car, her boyfriend's head was tilted toward the window; she expressed her belief that the knife would have stabbed Aalso had he been sitting in a normal driving position.

Appellant eventually quit banging on the car and left; Aalso and Joyce then drove home where they later called the police and reported the incident.

In defense to the charge that he had assaulted Aalso with a deadly weapon, appellant testified that it was not his intent to stab Aalso, but only to

"convince him to leave me alone." The jury convicted appellant of assaulting A also with a deadly weapon.

APPEAL

I

Appellant's primary contention is that the trial court erred when it allowed the prosecution to impeach his testimony with a voluntary manslaughter conviction suffered in 1980.

Prior to trial, appellant made a *"Beagle"* motion (*People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]) to exclude the prior manslaughter conviction. The prosecution argued that Proposition 8[4] essentially overturned the balancing process mandated by *Beagle*.[5] The trial court agreed and allowed the prosecution to use the prior manslaughter conviction to impeach appellant's testimony on all charges, including the possession of a concealable firearm charge, which offense occurred *before* the effective date of Proposition 8.

Appellant initially argued on appeal that the trial court had erred only with respect to the possession of a concealable firearm charge, essentially conceding that in the wake of Proposition 8 the prior manslaughter conviction had been properly admitted to impeach his testimony relating to the crimes which occurred *post*-Proposition 8. While the present case was pending before us, however, the Supreme Court held in *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], that despite the language of section 28, subdivision (f) (see, *ante,* fn. 4), trial courts retain section 352 discretion to exclude evidence of prior convictions. We requested and have received additional briefing on the issues *Castro* presents.

Having considered all arguments, we conclude that the prior was erroneously admitted on the pre-Proposition 8 charge since voluntary manslaughter does not directly bear on veracity in the *Beagle* sense, but that the prior necessarily involved "moral turpitude" as that term is used in *Castro* and hence could have been used for impeachment on the post-Proposition 8 charges. While error in the admissibility of the prior thus

[4]Specifically, the prosecution relied on article I, section 28, subdivision (f), of the California Constitution enacted by Proposition 8 which provides in pertinent part that "[a]ny prior conviction of any person in any criminal proceeding, . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding."

[5]*Beagle* held, in essence, that a trial court must weigh the probative value of a prior conviction against its prejudicial effect under section 352 of the Evidence Code in deciding whether the prior may be used to impeach a witness. (*Beagle, supra,* 6 Cal.3d at p. 447.)

infected only the one charge, we conclude that the court nevertheless erred as to the post-Proposition 8 charges by failing to exercise its discretion under Evidence Code section 352. Finally, we find all error to be harmless.

*Pre-Proposition 8*

■ Proposition 8 applies only to crimes committed on or after its June 9, 1982, effective date. (*People* v. *Smith* (1983) 34 Cal.3d 251, 258, 262 [193 Cal.Rptr. 692, 667 P.2d 149].) Therefore, impeachment on the firearm possession charge, which was predicated on conduct occurring before that date, was governed by *Beagle* and its pre-Proposition 8 progeny. Under those standards, which require that a prior involve an element of fraud, deceit or dishonesty before it is admissible for impeachment, voluntary manslaughter is not admissible. (*People* v. *Woodward* (1979) 23 Cal.3d 329, 340 [152 Cal.Rptr. 536, 590 P.2d 391]; *People* v. *Gardner* (1975) 52 Cal.App.3d 559, 561 [125 Cal.Rptr. 186], overruled on other grounds in *People* v. *Wheeler* (1978) 22 Cal.3d 258, 287, fn. 35 [148 Cal.Rptr. 890, 583 P.2d 748]; Evid. Code, § 788.) The People concede error as to admissibility; they further concede that the court's failure to exercise discretion to exclude the prior would be an independent basis for error, even if the prior had been admissible.

*Post-Proposition 8*

■ Concerning impeachment on the two post-Proposition 8 charges, the preliminary question is whether voluntary manslaughter is a crime necessarily involving "moral turpitude" as that term is used in *Castro*. *Castro* directs us to look for guidance in other bodies of law—particularly attorney discipline and immigration cases—in which the term "moral turpitude" has similarly been applied to felonies. (*Castro, supra,* 38 Cal.3d 301, 316, fn. 11.)

For purposes of attorney discipline actions, our state's high court has made it clear that voluntary manslaughter does *not* connote moral turpitude in every case. Rather, the court requires an assessment of the circumstances in each case. In *In re Strick* (1983) 34 Cal.3d 891 [196 Cal.Rptr. 509, 671 P.2d 1251], the court decided that an attorney's acts resulting in convictions for voluntary manslaughter and assault supported a preliminary finding of probable cause that the offenses involved moral turpitude so as to warrant interim suspension of the attorney pending final disciplinary action. (*Id.,* at pp. 896-900, 905.) Noting that it had referred that matter and two other pending disciplinary matters to the State Bar for a report and recommendation "as to whether the facts and circumstances surrounding the offenses involved moral turpitude or other misconduct warranting discipline," the court stated,

*"None of the offenses involve moral turpitude per se."* (P. 897, italics ours, citing Bus. & Prof. Code, § 6102, subds. (a) and (c), and *In re Rothrock* (1940) 16 Cal.2d 449, 455 [106 P.2d 907, 131 A.L.R. 226].) The court elaborated on its referral procedure, quoting subdivision (a) of Business and Professions Code section 6102: "Interim suspension is mandated in cases where from the record of conviction it appears that the crime 'involved or that there is probable cause to believe that it involved' moral turpitude. We refer to the State Bar those cases *where moral turpitude is not inherent in the offense itself.*" (*In re Strick, supra,* 34 Cal.3d at p. 899, italics added; see also *In re Nevill* (1985) 39 Cal.3d 729, 733 [217 Cal.Rptr. 841, 704 P.2d 1332] [matter of attorney's conviction for voluntary manslaughter referred to State Bar].)

In light of *In re Strick,* there can be no doubt that the crime of voluntary manslaughter does not inherently involve "moral turpitude" as that term has come to be understood in attorney disciplinary proceedings. Whether voluntary manslaughter constitutes "moral turpitude" as that term is defined and applied in *Castro* for purposes of impeaching a witness, however, is a significantly different question. Our state courts have been reluctant to hold that any but the most heinous crimes constitute moral turpitude per se, not only in attorney disciplinary cases, but as well in cases where an individual's vested and constitutionally protected right to pursue any particular profession or vocation is at stake. "Although we have variously defined 'moral turpitude' in such broad terms as 'baseness, vileness or depravity' [citations], we have also decided that the question of whether a conviction involves moral turpitude so as to warrant revocation or suspension of a license to practice a profession cannot be determined in the abstract but depends rather on whether the conviction demonstrates unfitness to practice that profession [citations]. The state's power to regulate a profession cannot be used arbitrarily to penalize conduct having no demonstrable bearing upon fitness for its practice. [Citation.]" (*Cartwright* v. *Board of Chiropractic Examiners* (1976) 16 Cal.3d 762, 767 [129 Cal.Rptr. 462, 548 P.2d 1134]; but see *Wilson* v. *State Personnel Bd.* (1974) 39 Cal.App.3d 218, 221-222 [114 Cal.Rptr. 134] [rejecting any special requirement of a "nexus" between performance of a public employee's duties and any crime involving moral turpitude].) Not only does the state tread gently in that realm, but seemingly static standards of probity, such as "moral turpitude," take on different meanings in application to different professions, depending on the differing duties and responsibilities involved. (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 227-228 [82 Cal.Rptr. 175, 461 P.2d 375].)

The question under *Castro,* on the other hand, is not the complicated one of whether the crime bears on fitness for a particular occupation, but

rather whether the conviction, in its essential elements, shows the "readiness to do evil" necessary to support a reasonable inference of readiness to lie. (*Castro, supra,* 38 Cal.3d 301, 314, 317.) Discussing crimes of violence and other crimes that do not inherently imply dishonesty, the *Castro* court had this to say: "Obviously it is easier to infer that a witness is lying if the felony of which he has been convicted involves dishonesty as a necessary element than when it merely indicates a 'bad character' and 'general readiness to do evil.' Nevertheless, *it is undeniable that a witness' moral depravity of any kind has some 'tendency in reason'* (Evid. Code, § 210) *to shake one's confidence in his honesty.* We ourselves recognized this in *People v. Rist* [(1976) 16 Cal.3d 211 [127 Cal.Rptr. 457, 545 P.2d 833], where we said that 'convictions which are assaultive in nature do not weigh as heavily in the balance favoring admissibility as those convictions which are based on dishonesty or some other lack of integrity.' (16 Cal.3d at p. 222.) 'Not as heavily' does not, of course, mean 'not at all.'" (*Id.,* at p. 315, italics added.)

Do the least adjudicated elements of voluntary manslaughter necessarily exhibit, in the words of *Castro,* "moral depravity of any kind"? We say yes. Manslaughter is the unlawful killing of a human being without malice aforethought. (§ 192.) ■ Voluntary manslaughter, like murder, requires the intent to kill. (*People v. Germany* (1974) 42 Cal.App.3d 414, 419 [116 Cal.Rptr. 841]; see *People v. Flannel* (1979) 25 Cal.3d 668, 676 [160 Cal.Rptr. 84, 603 P.2d 1].) What distinguishes voluntary manslaughter from murder is the absence of malice. By statute, malice is negated if the intentional killing is the result of "a sudden quarrel or heat of passion" (§ 192, subd. (a))—otherwise known as adequate provocation—which requires that "'the defendant's reason was, at the time of his act, . . . disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' (*People v. Logan* (1917) 175 Cal. 45, 49 . . . .)" (*People v. Spurlin* (1984) 156 Cal.App.3d 119, 124 [202 Cal.Rptr. 663].) By decisional law, malice is also negated by an honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury (*People v. Flannel, supra,* 25 Cal.3d at p. 674)—the so-called theory of "imperfect" or "unreasonable" self-defense (*People v. Wright* (1985) 39 Cal.3d 576, 594 [217 Cal.Rptr. 212, 703 P.2d 1106], dis. opn. of Kaus, J.; *People v. Wickersham* (1982) 32 Cal.3d 307, 328 [185 Cal.Rptr. 436, 650 P.2d 311]). ■ ■ **fn.** ■ Until fairly recent statutory amendments went into effect, a third, judicially recognized, way to negate malice was to show diminished mental capacity. (*People v. Spurlin, supra,* 156 Cal.App.3d at p. 125; *People v. Flannel, supra,* 25 Cal.3d at p. 675; §§ 21-22, 28 and 188, as amended

by Stats. 1982, ch. 893, §§ 1-4, pp. 3317-3318; see also Stats. 1981, ch. 404, §§ 1-6, pp. 1591-1593.)[6]

 No matter what the avenue for reducing murder to the intentional killing called voluntary manslaughter, there is moral depravity in the act. A jury presented with the question of adequate provocation is asked to decide whether a reasonable person in the circumstances would have *acted* out of passion rather than judgment. (See CALJIC No. 8.42 (1979 rev.).) It is not asked to determine that a reasonable person's responsive act would have been an *intentional killing.* (*Ibid.*) The law finds mitigation in the motivation for the act but by no means forgives or condones as reasonable the act chosen. The killing is punished (§ 193, subd. (a)), not excused or justified (§§ 195, 197, 199).

The same is true of imperfect self-defense. By definition, no reasonable person would have responded to the situation by intentionally killing, as the defendant did. A person who acts unreasonably in deciding to intentionally commit the ultimate act of violence against another human being acts with serious moral depravity. Despite his subjective motivation, he has nonetheless acted unreasonably. Justice Tobriner's opinion for the court in *People* v. *Flannel, supra,* states with regard to an honest but unreasonable belief in the need to defend, "No matter how the mistaken assessment is made, an individual cannot genuinely perceive the need to repel imminent peril or bodily injury and simultaneously be aware that society expects conformity to a different standard." (25 Cal.3d 668, 679.) One might be tempted to reason that such lack of awareness of a societal duty is inconsistent with the "readiness to do evil" contemplated under the *Castro* court's definition of moral turpitude. However, Justice Tobriner's remarks in *Flannel* were addressed to the judicially created—and now legislatively overruled— awareness-of-societal-duty component of malice aforethought.[7] Nothing in

---

[6]While the reduction of murder to manslaughter due to diminished capacity is no longer available, it must be assumed that prior convictions may have been based on that theory for killings occurring before the effective date of the amendments.

[7]Exploring the mental state of malice aforethought, Justice Tobriner wrote in *Flannel, supra,* 25 Cal.3d 668, at page 679: "[A] person who carefully weighs a course of action, and chooses to kill after considering reasons for and against, is normally capable of comprehending his societal duty to act within the law. 'If, *despite such awareness,* he does an act that is likely to cause serious injury or death to another, he exhibits that wanton disregard for human life or antisocial motivation that constitutes malice aforethought.' (Italics added.)" (Quoting *People* v. *Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].) He continued, just before making the statement quoted, *ante,* in the text above, "Given this understanding of malice aforethought, we cannot accept the People's claim that an honest belief, if unreasonably held, can be consistent with malice." (*Flannel, supra,* 25 Cal.3d at p. 679.)

The awareness-of-societal-duty concept was abrogated by 1981 and 1982 amendments to the definition of malice contained in section 188, which now reads, in part: "Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice." (Stats. 1982, ch. 893, § 4, p. 3318; Stats. 1981, ch. 404, § 6, p. 1593.)

*Castro* suggests that the "readiness to do evil" necessary for moral turpitude requires or is limited to an awareness of societal duties in the sense formerly required for malice. "[A] witness' *moral depravity of any kind* has some 'tendency in reason' . . . to shake one's confidence in his honesty." (*Castro, supra,* 38 Cal.3d 301, 315, citation omitted and italics added.) As already noted, the moral depravity in voluntary manslaughter is the unjustified and intentional taking of human life, the ultimate moral wrong against society.

Nor does the formerly allowed incomplete "defense" of diminished capacity render the crime free of moral depravity. The degree of mental capacity required under this theory for voluntary (as opposed to involuntary) manslaughter, still required the capacity to intend to kill. (*People* v. *Tidwell* (1970) 3 Cal.3d 82, 86 [89 Cal.Rptr. 58, 473 P.2d 762], see CALJIC Nos. 8.41 (1979 rev.) and 8.45 (1979 rev.).) A jury would have had to find that, "due to diminished capacity caused by mental illness, mental defect, or intoxication, the defendant did not have the capacity to form the mental state constituting malice aforethought, *even though the killing was intentional, voluntary, deliberate, premeditated, and unprovoked.*" (CALJIC No. 8.41, *supra,* italics added.)

In all three instances—provocation, imperfect self-defense and diminished capacity—the law looks at the motivation (or partial lack of capacity) behind the killing with empathy and compassion, but does not forgive the intentional killing that results. Moral turpitude is said to depend to an extent on the state of public morals. (*Castro, supra,* 38 Cal.3d 301, 334, fn. 2, conc. and dis. opn. of Bird, C. J.) Contemporary society's view of voluntary manslaughter as morally reprehensible is dramatically underscored by a 1983 amendment to section 193, subdivision (a), which changed the former punishment of the crime from "two, four, or six years" to "three, six, or eleven years." (Stats. 1983, ch. 941, § 2, p. 3398.) To say that a crime as serious as voluntary manslaughter does not necessarily involve *moral depravity of any kind* would do violence to *Castro* itself. There the Supreme Court held that possession of heroin for sale was a crime necessarily involving moral turpitude, not for the possession element of the crime, but solely because possession *for sale* necessarily evinced "the intent to corrupt others." (38 Cal.3d at p. 317, fn. omitted.) If the intent to corrupt others furnishes sufficient moral depravity in every conviction of possessing heroin for sale, regardless of extenuating circumstances, then so must the intent to kill which inheres in every conviction of voluntary manslaughter (*People* v. *Van Ronk* (1985) 171 Cal.App.3d 818, 823 [217 Cal.Rptr. 581]), regardless of which mitigating factor reduces the homicide from murder to manslaughter.

We thus agree in substance with the court's reasoning in *People* v. *Parrish* (1985) 170 Cal.App.3d 336 [217 Cal.Rptr. 700] (rev. den. Nov. 14, 1985): "[T]he intentional taking of a human life, whatever the excuse for doing so, involves the intent to do harm to another. The intent to do evil is always involved in the intentional taking of a human life. Accordingly, . . . voluntary manslaughter necessarily involves moral turpitude within the meaning of that term as used in *Castro.*" (*Id.,* at p. 351.) Any prior conviction for voluntary manslaughter is therefore prima facie admissible under *Castro* subject, of course, to the trial court's discretion to exclude that evidence under Evidence Code section 352. (*Castro, supra,* 38 Cal.3d 301, 306, 312, 316.)

For reasons already stated above, we find little guidance in California attorney discipline cases, which approach the phrase "moral turpitude" as a synonym for "unfit to practice law" rather than as a test for moral depravity and witness credibility. (Accord *People* v. *Armendariz* (1985) 174 Cal.App.3d 674, 682 [220 Cal.Rptr. 229]; *People* v. *Cavazos* (1985) 172 Cal.App.3d 589, 595 [218 Cal.Rptr. 269].)

However, we find meaningful guidance in the federal immigration cases' interpretation of the statutory term "moral turpitude," used to describe crimes that render an alien deportable or excludable. (See 8 U.S.C. §§ 1251(a)(4), 1182(a)(9).) ■ The federal courts confine their determination, as we must under *Castro,* to the face of the statute violated or to the inherent nature of the offense, disregarding the individual circumstances of the case. (*Castle* v. *Immigration & Naturalization Serv.* (4th Cir. 1976) 541 F.2d 1064, 1066 & fn. 5; *Okabe* v. *Immigration and Naturalization Service* (5th Cir. 1982) 671 F.2d 863, 865; *McNaughton* v. *Imm. & Nat. Service* (9th Cir. 1980) 612 F.2d 457, 459; *Castro, supra,* 38 Cal.3d 301, 317.) ■ Starting with a decades-old case law definition of "moral turpitude" identical to that used in California for attorney discipline cases (compare *Ng Sui Wing* v. *United States* (7th Cir. 1931) 46 F.2d 755, 756, with *In re Strick, supra,* 34 Cal.3d 891, 901), the federal courts have invariably held that voluntary manslaughter (i.e., manslaughter requiring the intent to kill) always involves moral turpitude. (*De Lucia* v. *Flagg* (7th Cir. 1961) 297 F.2d 58, 60-61, cert. den. (1962) 369 U.S. 837 [7 L.Ed.2d 843, 82 S.Ct. 867] ["So long as the homicide is voluntary and not justifiable no amount of provocation can remove it from the class of crimes involving moral turpitude"]; see *United States* v. *Karnuth* (W.D.N.Y. 1929) 30 F.2d 825, 825-826; see also *Brymer* v. *United States* (9th Cir. 1936) 83 F.2d 276, 276; *Pillisz* v. *Smith* (7th Cir. 1931) 46 F.2d 769, 770; *United States* v. *Day* (2d Cir. 1930) 42 F.2d 217, 217; cf. *In re Di Cola* (D.R.I. 1934) 7 F.Supp. 194, 195 [no moral turpitude for manslaughter committed through negligent or reckless operation of a vehicle]; *United States* v. *Karnuth,*

*supra,* 30 F.2d at p. 826 [no moral turpitude in second degree manslaughter designated as an act resulting in death but "without design to injure or effect death"].) The focus, as in *Castro,* is whether the crime shows moral depravity. The Seventh Circuit Court of Appeals put it well in *Pillisz* v. *Smith, supra:* "We know of no greater moral law than that which discountenances the taking of human life without excuse, and one who violates it is to that extent morally depraved. We hold, therefore, that moral turpitude was involved in the crime [of manslaughter] for which the alien was convicted." (46 F.2d at p. 770.)

Given the differing purposes and conflicting holdings between the federal immigration cases and the California attorney discipline cases,[8] we find the reasoning of the federal cases more applicable to the *Castro* "moral turpitude" inquiry and hence more persuasive (accord *People* v. *Parrish, supra,* 170 Cal.App.3d 336, 350-351). Nevertheless, as shown above, our own analysis leads independently to the same conclusion as that reached by the federal courts.

We hold that voluntary manslaughter necessarily involves moral turpitude under *Castro.*

In dissenting from this conclusion, our colleague constructs an elaborate but misfocused argument. Limiting his view of moral depravity to the policy judgments underlying "malice aforethought"—a rigid concept that finds parallel expression in no other area of the criminal law than murder—he ignores *Castro's* invitation to consider "moral depravity *of any kind*" (*Castro, supra,* 38 Cal.3d 301, 315, italics added). In his view, the seriousness of the act (judged by contemporary standards) and the proven intent to commit it count for nothing, and, in his estimation, such act may be considered "morally defensible." (Conc. and dis. opn., *post,* at pp. 1125-1126.) He loses sight of our goal under *Castro,* which is not to decide what circumstances should relieve a killer of society's harshest penalties but, instead, what circumstances provide "some basis—however tenuous—for inferring that a person . . . is more likely to be dishonest than a witness about whom no such thing is known." (*Castro, supra,* at p. 315, fn. omitted.) In that frame of reference, we believe that a juror charged with the solemn task of sorting out the truth from often incomplete and conflicting testimony would want to know that a particular witness once (1) reacted to reasonably aroused passions by killing, (2) needlessly killed in "self-defense" as the result of rash judgment, or (3) killed without the presence of

---

[8]The surprising and perhaps embarrassing fact evident from the conflicting federal and California decisions is that a person who commits voluntary manslaughter is immediately deportable but might otherwise be allowed to practice law in California.

mind to harbor "malice aforethought" or to fully appreciate the killing. However tenuous the connection of voluntary manslaughter to the juror's task, the connection nonetheless exists.

Our colleague concludes that an intent to kill, without more, does not indicate the readiness to do evil required by *Castro*. This is specious reasoning. The conclusion is correct as stated, but it overstates the case. In this majority opinion, we have recited the statutory definition of voluntary manslaughter as "the *unlawful killing* of a human being without malice." (§ 192, italics added.) The modifying phrase "unlawful killing" clearly answers both the dissent's "lawful death sentence" example and its reliance on the statutorily provided defense of self-defense. Our colleague fails to see that once statutory authorization and self-defense are removed from consideration, one is left with the intentional killing of another human being. The intentional killing may be without malice, but it also is without lawful authorization.

The dissent attempts to screen this *unlawful* aspect of voluntary manslaughter by saying it is either objectively reasonable (heat of passion), or involved a significant element of honesty (mistaken belief), or was induced by a mental defect that rendered the actor incapable of comprehending the duty to comply with law and unable to harbor malice (diminished capacity). (Conc. and dis. opn., *post,* at p. 1118.) There is nothing "reasonable" or "honest" about intentionally and unlawfully taking the life of another. What our colleague fails to recognize is that while his depiction of these forms of mitigation removes malice, and therefore murder, from consideration, it fails to remove the unlawfulness of intentionally killing another human being. Nor does his description of mitigation involved in voluntary manslaughter remove the moral reprehensibility of the act. Therefore, the "readiness to do evil" patina which covers voluntary manslaughter remains.

Having concluded that the prior was prima facie admissible for impeachment on the two post-Proposition 8 charges in this case, we must conclude that the trial court nevertheless erred by concluding that it had no discretion to exclude the prior under Evidence Code section 352. (*Castro, supra,* 38 Cal.App.3d 301, 317.) We therefore must assess the effect of the error.

*Prejudice*

Both *Castro* and pre-Proposition 8 *Beagle* cases require that we assess prejudice caused by *Beagle-Castro* error under the standard articulated

in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].[9] That is, we will reverse a conviction only when we are of the opinion that it is reasonably probable a result more favorable to the defendant would have occurred in the absence of the *Beagle-Castro* error. (*Castro, supra,* 38 Cal.3d at pp. 318-319; *People* v. *Cole* (1982) 31 Cal.3d 568, 581 [183 Cal.Rptr. 350, 645 P.2d 1182].)

We note first that appellant took the stand in his defense and testified with respect to all of the criminal incidents. Thus, this is not a case where we have "no way of knowing what defendant's testimony would have been [and therefore] no basis for concluding that such testimony would not have affected the result." (*People* v. *Barrick* (1982) 33 Cal.3d 115, 130 [187 Cal.Rptr. 716, 654 P.2d 1243]; see also *People* v. *Spearman* (1979) 25 Cal.3d 107, 119 [157 Cal.Rptr. 883, 599 P.2d 74]; *People* v. *Fries* (1979) 24 Cal.3d 222, 233-234 [155 Cal.Rptr. 194, 594 P.2d 19].) Since appellant testified and was cross-examined, we have a sound basis for assessing the impact of the error.

A number of factors have been identified by the appellate courts to aid in assessing whether *Beagle-Castro* error requires reversal in a particular case. These factors include the strength of the case against the defendant (*Castro, supra,* 38 Cal.3d at p. 318; *People* v. *Cole, supra,* 31 Cal.3d at p. 581; *People* v. *Rollo* (1977) 20 Cal.3d 109, 120 [141 Cal.Rptr. 177, 569 P.2d 771]; *People* v. *Kent* (1981) 125 Cal.App.3d 207, 216 [178 Cal.Rptr. 28]); the emphasis which the prosecution places on the prior conviction as it bears on credibility (*People* v. *Cole, supra,* at p. 581; *People* v. *Rollo, supra,* at p. 120); and whether, in light of other evidence in the case, the witness' testimony would have "strained the credulity of a rational trier of fact in such fashion as to render the improper references to appellant's previous convictions of little consequence." (*People* v. *Betts* (1980) 110 Cal.App.3d 225, 233-234 [167 Cal.Rptr. 768].)

---

[9]With regard to the standard for assessing harmless error in post-Proposition 8 cases, we note an anomaly in the *Castro* case. *Castro* held that federal due process "forbids the use of convictions of felonies which do not necessarily involve moral turpitude." (*Castro, supra,* 38 Cal.3d at p. 306.) It follows that impeachment of a testifying defendant with an irrelevant prior violates due process. Since the defendant in *Castro* was herself impeached with an irrelevant prior (simple possession of heroin) her due process rights were violated. Presumably, the minimum standard of federal constitutional error is the *Chapman* test: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Yet *Castro* applied the less stringent *Watson* standard, and concluded that the error was harmless. Since we have determined that appellant was impeached with a prior conviction for a felony not involving moral turpitude, we must presume that his federal due process rights were violated. Nevertheless, we feel compelled by stare decisis to apply the *Watson* standard, since the Supreme Court did so under identical circumstances in *Castro*.

We note initially that the error was clearly harmless with respect to the convictions for vandalism and misdemeanor battery of a police officer. As indicated earlier, appellant presented no defense to these charges, and his trial counsel conceded in final argument that the People had proved them "beyond a reasonable doubt." Thus, with respect to these charges, appellant's credibility was not at issue.

We also find that the error was harmless with respect to the possession of a concealable firearm charge. The case against appellant was extremely strong—he in fact admitted that after he had found the gun in the grader he maintained knowing possession of it. His defense to this charge was instead based on self-defense. Specifically, he claimed it was necessary for him to use the gun to protect himself from the group of "Mexicans." In order to establish this defense appellant was required to show, inter alia, that a *reasonable person* would have believed he was in imminent danger of great bodily harm, and that there was no other alternative means of avoiding the danger presented. (*People* v. *King* (1978) 22 Cal.3d 12, 24 [148 Cal.Rptr. 409, 582 P.2d 1000]; CALJIC No. 12.40.2 (1984 pocket pt.).) Appellant testified that he confronted the group because he had to stop the grader in order to change gears. However, the truck was some 20 feet away from the grader when appellant stopped, and none of the Mexicans approached the grader; instead, appellant dismounted the grader and approached them. Appellant testified that he did so because he was afraid he would be shot in the back if he were to drive away. We believe this contention "strained the credulity of a rational trier of fact . . . ." (*People* v. *Betts*, *supra*, 110 Cal.App.3d 225, 234.) Appellant was driving a large piece of heavy equipment; it took less than a minute to change gears. The group of Mexicans made only verbal threats and from a distance of some 20 feet. Appellant's asserted fear that he would be shot in the back is even more suspect in light of his testimony that he had initially planned to confront the group with a pipe or wrench. Certainly, if he genuinely believed the group was armed, he would more likely have made a run for it, rather than openly confront the group with a pipe or wrench.

Additionally, the prosecutor simply did not rely on the prior conviction to attack appellant's credibility; she relied instead on appellant's bias and motive to lie, and emphasized his other admitted lies. Thus, the prosecutor placed no emphasis on the prior conviction as impeaching evidence.

Finally, with respect to the assault with a deadly weapon charge, we note that the case against appellant was also very strong, and that in her final argument the prosecutor again did not rely on the prior manslaughter conviction to impeach appellant's credibility. Appellant's defense to this charge was that he did not have the general criminal intent to commit

assault; that is, he did not intend "to commit an act, the direct natural and probable consequence of which . . . would be the application of physical force upon the person of another." (CALJIC No. 9.00 (1984 pocket pt.).) In other words, he claimed that by stabbing through the car he did not intend to commit a battery. (*People* v. *Parks* (1971) 4 Cal.3d 955, 959 [95 Cal.Rptr. 193, 485 P.2d 257].) It is true that appellant's credibility was at issue with respect to this defense; nevertheless, considering the facts surrounding the offense and the fact that the prosecution did not emphasize the prior conviction to attack appellant's credibility, we do not believe it is reasonably probable that a result more favorable to appellant would have occurred in the absence of the *Beagle-Castro* error. We therefore find the error harmless.[10]

## II-III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

For reasons expressed in the unpublished portion of this opinion, the judgment is modified to reflect that the five-year enhancement imposed pursuant to Penal Code section 667 shall run consecutively *only* to the term imposed for count 6 in information number 84577 (assault with a deadly weapon). As so modified, the judgment is affirmed.

Rouse, J., concurred.

**KLINE, P. J.,** Concurring and Dissenting.—I concur in the judgment because, for the reasons set forth by the majority, I agree that the error is harmless. I write separately for the sole purpose of expressing my disagreement with the majority's conclusion that the offense of voluntary man-

---

[10]In related contentions, appellant argues that the trial court erred when it denied his motion to admit the prior conviction element of the possession of a concealable firearm charge or, alternatively, to sever that charge and try it separately. (*People* v. *Hall* (1980) 28 Cal.3d 143, 151-158 [167 Cal.Rptr. 844, 616 P.2d 826].) The trial court did so because it believed it was bound by California Constitution article I, section 28, subdivision (f) (enacted by Proposition 8) which provides in pertinent part: "When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court." As indicated earlier, the trial court improperly applied section 28, subdivision (f), to the possession of a concealable firearm charge because it predated the effective date of Proposition 8. The People concede this error. For reasons stated in our discussion of the *Beagle-Castro* error, the court's failure to allow appellant to admit the prior or to sever the trial must also be deemed harmless error. (*People* v. *Hall, supra,* 28 Cal.3d at pp. 157-158.)

*See footnote, *ante,* page 1094.

slaughter necessarily involves "moral turpitude" within the meaning of *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].

*Castro* expounds upon the principle that a witness may not be impeached with a prior felony conviction unless that conviction is rationally indicative of a propensity to lie. The determination whether a felony conviction bears adversely upon credibility would not be difficult if it could be assumed either that *any* felony conviction provides the necessary nexus or that it is only provided by conviction of those felonies which involve an element of dishonesty. Such assumptions are, however, forbidden by *Castro*; the former on due process grounds,[1] the latter on the theory that felonies which involve "moral depravity" other than dishonesty, such as crimes of violence, still may provide "some basis—however, tenuous—for inferring that a person who has committed [such a crime] is more likely to be dishonest than a witness about whom no such thing is known." (*Castro, supra,* at p. 315, fn. omitted.)

The precise question we confront in this case is whether, though the offense does not involve an element of dishonesty, prior conviction of voluntary manslaughter nonetheless demonstrates such "moral depravity" or "a general readiness to do evil" that it rationally relates to a witness's "readiness to lie." As stated in *Castro,* "felony convictions which do not involve 'readiness to do evil'—moral turpitude, if you will—bears [*sic*] no rational relation to the witness' readiness to lie." (*Castro, supra,* p. 314.)

The inquiry into evil or moral turpitude mandated by *Castro* is a departure for the criminal law because, as Holmes has stated, "the aim of the law is not to punish sins, but is to prevent certain external results."[2] (*Common-*

---

[1] The lead opinion in *Castro* acknowledges that in *State* v. *Ruzicka* (1977) 89 Wn.2d 217 [570 P.2d 1208], the Supreme Court of Washington held that the Legislature could reasonably determine that there was a nexus between a person having committed crimes and that person's propensity to lie. As stated in *Castro,* "To the extent that this statement encompasses crimes not involving moral turpitude of any kind, we must disagree on due process grounds." (*People* v. *Castro, supra,* 38 Cal.3d 301, 314, fn. 8.)

[2] Holmes elsewhere tried to show "that the general principles of criminal and civil liability are the same, [and that] it will follow from that alone that theory and fact agree in frequently punishing those who have been guilty of no moral wrong, and who could not be condemned by any standard that did not avowedly disregard the personal peculiarities of the individuals concerned." (Holmes, The Common Law (Howe ed. 1963) p. 38.)

Holmes' view has its roots in the utilitarian theories of John Stuart Mill and Jeremy Bentham. According to Mill, for example, "the only purpose for which power can be rightfully exercised over any member of a civilized society against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinions of others, to do so would be wise or even right." (Mill, On Liberty (Rapaport ed. 1978.) See also, Bentham, Principles of Morals and Legislation (Harrison ed. 1948).) The idea that criminal responsibility is not necessarily coincident with moral blameworthiness has more lately been advanced by H. L. A. Hart. (See, e.g., Hart, The Concept of Law (1961) chaps. VIII and IX; Hart, Morality of the Criminal Law (1964) and Hart, Law, Liberty and Morality (1963)).

*wealth* v. *Kennedy* (1897) 170 Mass. 18, 20 [48 N.E. 770].) The difficulty of the inquiry is exacerbated for us because under *Castro* we may not look behind the fact of the prior conviction. Adopting the *Finley-Crowson* line of cases (*In re Finley* (1968) 68 Cal.2d 389, 392-393 [66 Cal.Rptr. 733, 438 P.2d 381]; *People* v. *Crowson* (1983) 33 Cal.3d 623, 633-635 [190 Cal.Rptr. 165, 660 P.2d 389]), *Castro* declares that a prior conviction is relevant to credibility and admissible for impeachment only if "the *least adjudicated elements* of the conviction *necessarily* involve moral turpitude." (*Castro, supra,* 38 Cal.3d at p. 317, italics added.) In other words, we must make the necessary determination as an abstract proposition and, most significantly, must find the prior conviction inadmissible for impeachment if, as a matter of law, it could properly have been sustained upon *any* facts not rationally indicative of moral turpitude.

Consistent with this principle, I cannot conclude that, as a matter of law, voluntary manslaughter *necessarily* involves moral turpitude or has any tendency in reason to show dishonesty.

It must be understood, preliminarily, that manslaughter is the mitigated form of murder, which is the basic homicide offense. The general common law rule, as formulated by Blackstone, is that the killing of another human being "amounts to murder unless where *justified* by the command or permission of the law; *excused* on the ground of accident or self-preservation; or *alleviated* into manslaughter, . . . ." (4 Blackstone, Commentaries 201, original italics.) Though murder and manslaughter both involve the element of intent to kill and result in the same harm, the offenses are very distinct: manslaughter is not committed, as is murder, with malice aforethought. (Pen. Code, §§ 187, 192.)[3] It is thus the absence of malice that alleviates murder into manslaughter.

The malice which distinguishes murder from manslaughter is an elusive concept which does not lend itself to inclusive or comprehensive definition. (*People* v. *Gorshen* (1959) 51 Cal.2d 716, 730, fn. 11 [336 P.2d 492], disapproved on other grounds in *People* v. *Wetmore* (1978) 22 Cal.3d 318, 324 [149 Cal.Rptr. 265, 583 P.2d 1308].) The Penal Code, which provides that such malice, "may be express or implied," goes on to state simply that "[i]t is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable

---

[3]Development of the distinction between murder and manslaughter is believed to have commenced in the 14th century. See Kaye, *The Early History of Murder and Manslaughter* (1967) 83 Int'l & Comp. L.Q. Rev. 365 (pt. I), 569 (pt. II).

provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.)[4]

As it relates to homicide, the concept of malice can most safely be defined as a state of mind that exists only in the absence of circumstances of justification, excuse or mitigation.[5] Safe as this negative definition may be, however, it cannot be forgotten that malice aforethought remains fundamentally a matter of mind, it "is a psychical fact just as homicide is a physical fact. It is the particular kind of mens rea or mind at fault which is required for the more serious of the two types of felonious homicide." (Perkins, *A Re-examination of Malice Aforethought, supra,* 43 Yale L.J. at p. 567; see also Perkins & Boyce, Criminal Law (3d ed. 1982) pp. 73-75.)

Many who have authoritatively endeavored to define this state of mind have done so by utilizing the very words employed in *Castro* to define "moral turpitude." Thus, for example, it was said by Blackstone that malice aforethought relates to "evil design" or to "a wicked, depraved and malignant heart."[6] Similarly, Salmond stated that "the malice of English law[] include[es] all forms of evil purpose, design, intent or motive." (Salmond, Jurisprudence, *supra,* p. 399.) Such definitions suggest that the *absence* of malice is not only compatible with but may be indicative of the absence of evil purpose, the absence of a depraved heart, and the absence, therefore, of such moral turpitude as is defined in terms of evil and depravity.

The correlation between malice and moral turpitude is not, however, based merely on semantics. As will be seen, the mitigating factors sufficient in law to negate malice and thereby reduce murder to voluntary manslaughter

---

[4]On the meanings of "express" and "implied" malice, see Perkins, *A Re-Examination of Malice Aforethought* (1934) 43 Yale L.J. 537, 546-552.

The words "malice" and "maliciously" are also defined in Penal Code section 7 as importing "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." However, insofar as homicide is concerned, the word "malice" means "'something more than the word imports as defined in section 7.'" (*People* v. *Gorshen, supra,* 51 Cal.2d 716, 730, quoting *People* v. *Waysman* (1905) 1 Cal.App. 246, 248 [81 P. 1087].)

[5]Thus, the Alabama Supreme Court has declared that "Malice, as an ingredient of murder, may be defined, in legal phrase, as the killing of a human being, without legal justification, excuse or extenuation." (*Cribbs* v. *State* (1889) 86 Ala. 613, 616 [6 So. 109, 110].)

[6]"Malice aforethought . . . the grand criterion which now distinguishes murder from other killing . . . is not so properly spite or malevolence to the deceased in particular, as any evil design in general; the dictate of a wicked, depraved and malignant heart; *un disposition a faire un male chose* (a disposition to commit a bad action) . . ." (4 Blackstone, *supra,* p. 199.) Blackstone's definition is consistent with the meaning of the Latin word *malitia,* which is thought to connote "badness, physical or moral—wickedness in disposition or in conduct—not exclusively ill-will or malevolence . . . ." (Salmond, Jurisprudence (7th ed. 1924) p. 399.)

are close to those which excuse and even justify homicide. (See Pen. Code, §§ 195, 197.)[7] Although the proposition may sound strange, a conviction of voluntary manslaughter in this state represents, among other things, a conclusion by the trier of fact that the defendant sustained his burden of showing[8] that though his killing of another human being was intentional it was also either (1) objectively reasonable, or (2) induced by an honest belief that he was in mortal danger, or (3) influenced by a mental defect that rendered him incapable of comprehending the duty the law imposes and unable to harbor malice. These are not the sort of considerations ordinarily associated with an evil design or a depraved heart.

The two mitigating factors that now may be used to negate malice and reduce a homicide from murder to voluntary manslaughter are (1) sufficient provocation and (2) an honest but unreasonable belief in the need to defend against imminent peril to life or great bodily injury. Until 1981, diminished mental capacity was a third means by which malice could be negated and a homicide reduced to manslaughter.[9]

Of these three avenues, the first, which is the only one provided by statute (Pen. Code, § 192, subd. (a)), is by far the most frequently employed. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 680 [160 Cal.Rptr. 84, 603 P.2d 1].) A homicide is provoked, and therefore legally presumed to have been committed without malice aforethought, if it occurred "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a)). In determining the sufficiency of the provocation the trier of fact is not permitted to consider any abnormal personal characteristics of the defendant, for his responsive conduct is measured by the objective standard of an exemplary person. As is well established, "the provocation must at least be such as would stir the

---

[7]The distinction between excuse and justification has been explained as follows: "In the case of 'justification' what is done is regarded as something which the law does not condemn, or even welcomes. . . . But where the killing (e.g. accidental) is excused criminal responsibility is excluded on a different footing. What has been done is something which is deplored, but the psychological state of the agent when he did it exemplified one or more of a variety of conditions which are held to rule out the public condemnation and punishment of individuals." (Hart, Punishment and Responsibility (1968) pp. 13-14, fn. omitted.)

[8]Unless the evidence introduced by the prosecution itself establishes some basis of justification or excuse, every homicide is presumed to have been committed with malice aforethought. Therefore, the burden is upon the defendant to come forward with facts showing justification, excuse or mitigation. (See, Perkins & Boyce, Criminal Law, *supra,* pp. 75-81; 4 Blackstone, *supra,* p. 201 [". . . all of these circumstances of justification, excuse or alleviation, it is incumbent upon the prisoner to make out, to the satisfaction of the court and jury . . . . For all homicide is presumed to be malicious until the contrary appeareth upon evidence."].)

[9]Penal Code section 28, subdivision (b), which was adopted by vote of the people in 1981, provides, inter alia, that "As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action or juvenile adjudication hearing."

resentment of a *reasonable* man. [¶] It cannot be urged that the homicide is manslaughter because it was committed in an unreasonable fit of passion. In an abstract sense anger is never reasonable; but the law, in consideration of human weakness, makes the offense manslaughter when it is committed under the influence of passion caused by an insult or provocation sufficient to excite an irresistible passion in a reasonable person; one of *ordinary* self control." (*People* v. *Hurtado* (1883) 63 Cal. 288, 292, italics added.) As the proposition has alternatively been stated, "[t]he fundamental of the inquiry . . . is whether the defendant's reason was, at the time of his act, disturbed or obscured by some passion—not necessarily fear, and never the passion for revenge—to such an extent as would render *an ordinary man of average disposition* likely to act rashly or without due deliberation and reflection; and from this passion rather than from judgment." (*People* v. *Brubaker* (1959) 53 Cal.2d 37, 44 [346 P.2d 8], cert. den. 365 U.S. 824 [5 L.Ed.2d 702, 81 S.Ct. 703], original italics; accord, *People* v. *Borchers* (1958) 50 Cal.2d 321, 329 [325 P.2d 97]; *People* v. *Bridgehouse* (1956) 47 Cal.2d 406, 413 [325 P.2d 97].)

I do not think criminal conduct legally determined to have been comparable to that of an ordinarily reasonable person of average disposition in the same circumstances can always be deemed "morally depraved;" nor do I believe such conduct bears upon veracity. A man who, for example, kills a flagrantly unfaithful wife who "taunt[s] him into jealous rages in an unconscious desire to provoke him into killing her and thus consummating her desire for suicide" may properly be found guilty of voluntary manslaughter (*People* v. *Berry* (1976) 18 Cal.3d 509, 514 [134 Cal.Rptr. 415, 556 P.2d 777]) and justly punished, but his criminal act does not provide evidence that may rationally be used to show he is depraved or dishonest. Indeed, a person may be convicted of voluntary manslaughter not in spite of but in some measure *because* there is "ample, uncontradicted, evidence that [he] was a man of excellent character . . . ." (*People* v. *Bridgehouse, supra,* 47 Cal.2d 406, 414.) Thus, it simply cannot be said that where a homicide was reduced to voluntary manslaughter upon the ground of sudden quarrel or heat of passion the least adjudicated elements of the offense *necessarily* involve "moral turpitude" in the sense of depravity or as relating to lack of credibility. As Holmes has pointed out, the reason provocation may reduce an offense which would otherwise be murder to manslaughter is because, "*[a]ccording to current morality,* a man is not so much to blame for an act done under the disturbance of great excitment, caused by a wrong done to himself, as when he is calm." (Holmes, The Common Law, *supra,* p. 51, italics added.)

Where the mitigating factor negating malice was an honest but unreasonable belief that killing another was necessary to defend against imminent

peril to life or great bodily injury,—that is, imperfect self-defense—a conviction of voluntary manslaughter may be thought to bear upon veracity, but it certainly does not show the lack thereof. As the Supreme Court stated in *People* v. *Flannel, supra,* 25 Cal.3d 668, an honest belief, even if unreasonably held, cannot be consistent with malice. "No matter how the mistaken assessment is made, an individual cannot genuinely perceive the need to repel imminent peril of bodily injury and simultaneously be aware that society expects conformity to a different standard. Where the awareness of society's disapproval begins, an honest belief ends." (*Id.,* at p. 679.)

The theory of imperfect self-defense articulated in *Flannel* developed out of the general common law rule that, subject to exceptions in certain cases, mistake of fact excuses conduct that would otherwise be criminal if the mistaken belief is honestly held, based upon reasonable grounds, and of such a nature that the conduct would have been lawful had the facts been as they were reasonably supposed to be. (See, e.g., *People* v. *Hernandez* (1964) 61 Cal.2d 529 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092]; *People* v. *Vogel* (1956) 46 Cal.2d 798 [299 P.2d 850].) Although, with respect to that rule, there is some dispute among the commentators about the significance that should attach to the requirement that the mistaken belief constitute a reasonable misapprehension,[10] there is no disagreement about the threshold requirement, which is the central feature of the theory of imperfect self-defense, that the mistaken belief be honestly entertained. "[T]he possibility of excuse based upon mistake of fact never has any application 'where there is no honest belief . . . but . . . a dishonest pretense is resorted to in the endeavor to escape punishment.' The mistaken belief must always be 'honest and real' rather than 'feigned'; sincere rather than a mere 'pretext.'" (Perkins & Boyce, Criminal Law, *supra,* at p. 1045, fns. omitted.) A conviction of manslaughter based upon imperfect self-defense may therefore indicate not just the absence of pretense but credibility, because the evidence of honest belief—which is the defendant's burden to produce and which usually consists of his own testimony—was believed by the trier of fact.

More importantly, the question whether the defendant's honest belief was reasonable or unreasonable is determined by an objective standard; that is, the defendant is presumed, at his peril, to possess the qualities of a reasonable person. "Unless he can bring himself within some broadly defined exception to general rules, the law deliberately leaves his idiosyncrasies out of account, and peremptorily assumes that he has as much capacity to judge and to foresee consequences as a man of ordinary prudence would have in the same situation." (*Commonwealth* v. *Pierce* (1884) 138 Mass. 165, 176, opn. of

---

[10]See discussion, *post,* at pages 1123-1124.

Holmes, J.) Application of this principle means that an individual can be convicted of voluntary manslaughter on a theory of imperfect self-defense though he "may be morally without stain, because he has less than ordinary intelligence or prudence." (Holmes, The Common Law, *supra,* at p. 43.) It therefore cannot be said that such a conviction necessarily involves moral turpitude.

It does not require lengthy analysis to establish that diminished capacity caused by mental illness, mental defect, or intoxication—which until 1981 was the remaining way in which malice could be negated and voluntary manslaughter established[11]—also does not necessarily show a general readiness to do evil nor have any tendency in reason to reflect adversely on credibility. As a result of the decision in *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911], a defendant could not be found guilty of murder of the first or second degree, but could be found guilty of voluntary manslaughter, if his mental capacity was so diminished that there existed a reasonable doubt whether he was able to form the mental states constituting either express or implied malice. Thus, a defendant with diminished mental capacity could not have been convicted of voluntary manslaughter unless the trier of fact believed the defendant was unable to form an intention unlawfully to kill another or that the killing was not done for a base anti-social purpose or entertained reasonable doubt with respect to these questions. A person who kills another without the mental capacity necessary to comprehend the duty not to do so or who kills without a base anti-social purpose may be presumed in law to have intended to kill, but that intention, without more, does not necessarily demonstrate either depravity or a propensity to lie.

It is significant, in this connection, that the jury instruction pertaining to the question whether a defendant claiming diminished capacity "was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death." (CALJIC No. 8.77 (1979 rev.)) did not limit inquiry to the awareness of legal obligation but permitted the jury to include moral responsibility within the broad meaning of the word "duty." (See *People* v. *Schmidt* (1915) 216 N.Y. 324, 330 [110 N.E. 945, 946-950].)[12] Thus a

---

[11]Diminished capacity must be considered because, looking only at the least adjudicated elements of the offense, the possibility cannot be excluded that a conviction prior to 1981 was reduced from murder to voluntary manslaughter on this basis.

[12]In *People* v. *Schmidt, supra,* the court was required to determine the meaning of the word "wrong" as it appeared in an instruction directing the jury to inquire whether at the time the defendant committed an act of homicide " 'he was laboring under such a defect of reason as either not to know the nature and quality of the act he was committing or that it was wrong.' " (216 N.Y. at p. 330, 110 N.E. at p. 946.) After a lengthy analysis of the history of that language, which history is also germane to the language of the subject California instruction, Justice Cardozo concluded that "it is impossible . . . to say that there is any

homicide could have been reduced to voluntary manslaughter because the jury, specifically addressing the moral question, found that the convicted person lacked the mental capacity to appreciate the moral duty he violated and therefore was not morally culpable.

My colleagues disagree with the foregoing analysis and conclude that "[n]o matter what the avenue for reducing murder to the intentional killing called voluntary manslaughter, there is moral depravity in the act." (Maj. opn. at p. 1107.)

The majority commences its analysis by asserting that "[a] jury presented with the question of adequate provocation is asked to decide whether a reasonable person in the circumstances would have *acted* out of passion rather than judgment. . . . It is not asked to determine that a reasonable person's responsive act would have been an *intentional killing*." (Maj. opn., p. 1107, original italics.) This statement makes a distinction where none exists (because the passionate act in question *is* an intentional killing) and thereby produces a contradiction. As my colleagues are unwilling to acknowledge, the jury is asked to determine whether a reasonable person's responsive act would have been an intentional killing. When it returns a verdict of guilty of voluntary manslaughter, a jury answers this question in the affirmative; in effect the jury says that an ordinarily reasonable man faced with the same situation as that confronted by the defendant might have acted similarly.

The majority's misperception of the law is revealed in its statement that, where the act was provoked, "[t]he law finds mitigation in the motivation for the act but by no means forgives or condones as reasonable the act chosen." (Maj. opn., p. 1107.) This statement is simply wrong. The law finds mitigation *because* the act is found objectively reasonable. What the majority really means to say, I think, is that an ordinarily reasonable man would never intentionally kill another human being. This is, I concede, a tenable view. As has been stated, the law of provocation "is a compromise, neither conceding the propriety of the act nor exacting the full penalty for it. This being so, how can it be admitted that paragon of virtue, the reasonable man, gives way to provocation?" (Williams, *Provocation and the Reasonable Man* (1954) Crim. L.Rev. 740, 742.) However, as is always conceded by those who argue that the reasonable man standard should have no place in laws defining homicide (E.g., Hall, *Negligent Behavior Should Be Excluded From Penal Liability* (1963) 63 Colum. L.Rev. 632; Collings, *Negligent Murder—Some Stateside Footnotes to Director of Public Prosecutions v. Smith* (1961) 49 Cal.L.Rev. 254, 285-291; Note, *Manslaughter and the*

decisive adjudication which limits the word 'wrong' in the statutory definition to legal as opposed to moral wrong. The trend of the decisions is indeed the other way." (*Id.*, at p. 338, 110 N.E. at p. 949.)

*Adequacy of Provocation: The Reasonableness of the Reasonable Man* (1958) 106 U.Pa. L.Rev. 1021), the fact remains that it does. The introduction into the law of homicide of the reasonable man standard, which had previously been associated with tort liability in the field of negligence, occurred more than a century ago.[13] This development may be thought unwise, but it cannot be denied. By insisting that which the law deems reasonable, and which therefore alleviates murder into manslaughter, is nevertheless unreasonable, the majority ignores the law.[14]

The majority also ignores the law pertinent to imperfect self-defense; though in this respect it adopts a point of view which seems to me entirely inconsistent with its approach to provocation. The majority believes a provoked killing is indicative of depravity because the objective nature of the mitigating factor ignores the subjective intent to kill. On the other hand, in concluding that imperfect self-defense is indicative of depravity the majority dismisses the subjective nature of the mitigating factor (honest belief in the need to defend against a threat to life) as beside the point.

According to the majority, "[a] person who acts unreasonably in deciding to intentionally commit the ultimate act of violence against another human being acts with serious moral depravity. *Despite* his subjective motivation, he has nonetheless acted unreasonably." (Maj. opn., p. 1107, italics added.) These statements focus upon the unreasonableness of the defendant's act

---

[13]The use of the reasonable man standard in this context is usually said to have first occurred in the celebrated English case of *Regina* v. *Welsh* (1869) 11 Cox.Cr.Cas. 336. In order to reduce the homicide to manslaughter by reason of provocation, the jury in *Welsh* was instructed to determine whether the evidence pointed up facts from which the killing could be attributed "to the violence of passion naturally arising thereform, and likely to be aroused thereby in the breast of a reasonable man." (*Id.,* at p. 338.) This standard was quickly adopted by courts in the United States. See Perkins & Boyce, Criminal Law, *supra,* p. 86, n. 71. Indeed, it may be argued that the reasonable man standard was adopted seven years prior to *Regina* v. *Welsh* by the Michigan Supreme Court in *Maher* v. *People* (1862) 10 Mich. 212. The fact that the reasonable man standard still enjoys considerable support is shown by the fact that it is an element of the Model Penal Code definition of manslaughter. (See Model Pen. Code, § 210.3.)

[14]The significance of the reasonable man standard is underscored by the repetitive manner in which it is impressed upon the jury. The standard instruction explaining sudden quarrel or heat of passion informs the jury, inter alia, as follows: "The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused *in the mind of an ordinarily reasonable person in the same circumstances.* A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passion of *the ordinarily reasonable man faced with the same situation.* The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent *as would cause the ordinarily reasonable person of average disposition* to act rashly and without deliberation and reflection, and from such passion rather than from judgment." (CALJIC No. 8.42 (1979 rev.), italics added.)

and the ultimate nature of the harm he caused, which are legally irrelevant to whether imperfect self-defense can be made out (because it is always assumed the act was based on an unreasonable belief and that death resulted), and casts aside what is truly the central consideration: the defendant's "subjective motivation." The most powerful criticism of the theory of imperfect self-defense is not that it gives too much weight to a defendant's subjective motivation, which seems to be the majority's concern, but that it does not give enough. Thus, in what remains one of the seminal analyses of the issue of mistake of fact, it is argued that, no matter how unreasonable it may be, an honest belief disproves mens rea and should not merely mitigate but exonerate the commission of a homicide. "If the defendant, being mistaken as to material facts, is to be punished because his mistake is one which an average man would not make, punishment will sometimes be inflicted when the criminal mind does not exist. Such a result is contrary to fundamental principles, and is plainly unjust, for a man should not be held criminal because of lack of intelligence. If the mistake, whether reasonable or unreasonable, as judged by an external standard, does negative the criminal mind, there should be no conviction." (Keedy, *Ignorance and Mistake in the Criminal Law* (1908) 22 Harv. L.Rev. 75, 84-85; see also, Fletcher, Rethinking Criminal Law (1978) § 9.2.3, pp. 707-713.)[15] It is not my purpose to urge that honest belief should excuse and not just mitigate homicide. This argument is relevant only because it calls attention to the contradiction between criminal intention and honest belief and thereby underscores the significance of the state of mind the majority untenably disregards.

The majority is not persuaded that diminished capacity renders a homicide free of moral depravity because, it points out, "[t]he degree of mental capacity required under this theory . . . still required the capacity to intend to kill." (Maj. opn. at p. 1108.) The test of diminished capacity set forth in *People* v. *Conley, supra,* 64 Cal.2d 310, does not focus upon the intent to kill, however, which is assumed, but on whether "because of mental defect, disease, or intoxication . . . the defendant is unable to comprehend his duty to govern his actions in accord with the duty imposed by law . . . ." (*Id.,* at p. 322.) As the court explained in *Conley,* included within the statutory definitions of express and implied malice is "[a]n awareness of the obligation to act within the general body of laws regulating society . . . ." (*Ibid.*) My colleagues do not explain how an intentional killing can be considered morally depraved where, because of a mental defect, the one

---

[15]The forcefulness of the view that an honest mistake should not just mitigate but completely excuse an intentional act is reflected in the fact that in certain circumstances it has been accepted by the United States Supreme Court and by courts in this and other states, albeit not with respect to homicides. (See, *Morissette* v. *United States* (1952) 342 U.S. 246 [96 L.Ed. 288, 72 S.Ct. 240]; *People* v. *Navarro* (1979) 99 Cal.App.3d Supp. 1 [160 Cal.Rptr. 692]; *People* v. *Weiss* (1938) 276 N.Y. 384 [12 N.E.2d 514, 114 A.L.R. 865].)

who committed it did not comprehend the duty not to violate the general body of laws governing society and was unable to "harbor malice." Despite the inexactness of the words used in the law to describe diminished capacity, I do not think a person determined to have been mentally incapable of harboring malice can easily be assumed capable of intending evil, much less deemed to have necessarily intended evil.

My colleagues' conclusion that voluntary manslaughter necessarily involves moral turpitude rests at bottom on the fact that, regardless of all other considerations, the offense remains an intentional killing. As they acknowledge, the substance of their reasoning is that expressed as follows in *People* v. *Parrish* (1985) 170 Cal.App.3d 336 [217 Cal.Rptr. 700]: "[T]he intentional taking of a human life, whatever the excuse for doing so, involves the intent to do harm to another. The intent to do evil is always involved in the taking of a human life. Accordingly, . . . voluntary manslaughter necessarily involves moral turpitude within the meaning of that term as used in *Castro*." (*Id.,* at p. 351; maj. opn., at p. 1109.) This putative syllogism is amiss because it adopts a simplistic conception of the intent to inflict harm or kill which begs the question most central to the law of homicide and most relevant to any moral judgment: Why did the actor form this intent? What was his purpose?[16] Thus, the statement that "the intent to do evil is always involved in the taking of a human life" goes much too far. If this were true then not only conviction of involuntary manslaughter, a negligent homicide, but justifiable homicide, such as that committed in self-defense, would also be evil; as would the act of the executioner at San Quentin, who kills in his official capacity pursuant to judicial decree. The intentional taking of a human life, without more, is not necessarily indicative of a readiness to do evil; for there are intentional homicides, described in sections

---

[16]The significance of this mental element, and the relative insignificance of the intent to kill, has been illustrated through the situation in which a lawful death sentence is carried out: "If a sheriff is carrying out such a sentence what difference does it make what his state of mind may be? The fallacy involved in this question lies in the fact that the mental element—the mind without fault—has been satisfied by the assumption that he is 'carrying out' a lawful sentence of death. If a sheriff who had no knowledge of any sentence of death having been pronounced should take the life of his prisoner for some unlawful purpose of his own, it would be no answer to a murder charge that there existed, unknown to him, a mandate for him to execute that man on that very day. The extreme unlikelihood of the officer's being unaware of the existence of the sentence does not affect the legal view of the situation. The knowledge that he is carrying out a sentence of the court makes this altogether different as a psychical fact than if he acted in ignorance of this matter. A felon may be killed lawfully under certain circumstances other than the execution of a sentence of death, as for example where this is the only means of preventing him from murdering an innocent victim, or of stopping his flight from arrest after the murder is committed. And there is an interesting case in which the shooting of an actual felon, under circumstances sufficient to justify the act had the facts been known, was held not to constitute a justification in favor of one who did not know or have any reason to believe that the person was a felon." (Perkins & Boyce, Criminal Law, *supra*, at p. 74, fn. omitted. See also, Perkins, *A Rationale of Mens Rea* (1939) 52 Harv. L.Rev. 905, 923.)

196 and 197 of our Penal Code, which are not only legally justifiable but morally defensible.

The proposition that "the intent to do evil is always involved in the taking of a human life" may be reduced to an absurdity because it ignores the central question of purpose, design or motive.

"A wrongful act is seldom intended and desired for its own sake. The wrongdoer has in view some ulterior object which he desires to obtain by means of it. The evil which he does to another, he does and desires only for the sake of some resulting good which he will obtain for himself. He *intends* the attainment of this ulterior object no less than he intends the wrongful act itself. His intent, therefore, is twofold, and is divisible into two *distinct portions, which we may distinguish as his immediate and his* ulterior intent. The former is that which relates to the wrongful act itself; the latter is that which passes beyond the wrongful act, and relates to the object or series of objects for the sake of which the act is done. . . . [Therefore] [e]very wrongful act may raise two distinct questions with respect to the intent of the doer. The first of these is: *How* did he do the act—intentionally or accidentally? The second is: If he did it intentionally, *why* did he do it? The first is an inquiry into his immediate intent; the second is concerned with his ulterior intent, or motive." (Salmond, Jurisprudence, *supra,* 397-398, original italics; see also, Holmes, The Common Law, *supra,* p. 45 ["intent . . . will be found to resolve itself into two things; foresight that certain consequences will follow from an act, and the wish for those consequences working as a motive which induces the act"]; and Cook, *Act, Intention, and Motive in the Criminal Law* (1917) 26 Yale L.J. 645.) The court in *Parrish* and my colleagues in this case conclude that voluntary manslaughter necessarily involves a readiness to do evil solely on the basis of the first inquiry. But it is the second inquiry, not the first, that bears upon whether a homicidal act is criminal and, if so, whether it is murder or manslaughter; and it is this latter inquiry, because it embodies the search for malice,[17] that sheds most light on the evil purpose, if any, involved in the act. The court in *Parrish* absolves itself of the responsibility to make this critical inquiry, as do my colleagues, by inferring the intent to do evil from the intent to kill. This is legally and logically impermissible. Malice aforethought cannot be inferred from the specific intent to kill because the specific intent to kill, which "is not necessarily the mental state known as malice aforethought" (*People* v. *Conley, supra,* 64 Cal.2d 310, 320), is compatible with both the presence and the absence of malice. Moreover,

---

[17]Referred to by one court as "the malice of the evil motive." (*Ramsey* v. *State* (1934) 114 Fla. 766 [154 So. 855, 856].)

malice may be present even in the absence of a specific intent to kill.[18] By irrationally inferring the intent to do evil, or malice, from the intent to kill, the court in *Parrish* and the majority herein use that which logically compels further inquiry as the reason not to undertake it.

This is not the law, however, and does not describe the manner in which a person may be convicted of voluntary manslaughter. As we know, such a conviction involves not just the threshold determinations that the defendant's homicidal act was intentional and neither justified nor excused, but the additional determination that a mitigating factor negated malice; i.e., that the act was either an objectively reasonable response to sufficient provocation or was committed *without* "a deliberate intention unlawfully to take away the life of a fellow creature," and *without* "an abandoned and malignant heart."[19] (Pen. Code, § 188.) To say that an act that lacks these indicia of malice is nonetheless performed, *indeed, is necessarily performed, with an intent to do evil* is, in the final analysis, to trivialize evil.

My colleagues take me to task for not recognizing that the mitigating factor that removes malice "fails to remove the unlawfulness of intentionally killing another human being." (Maj. opn., p. 1111.) The majority thinks this unlawful aspect of voluntary manslaughter undermines my entire argument. Again, they are mistaken.

Voluntary manslaughter is statutorily described as an "unlawful killing" presumably because it is neither excused nor justified by any of the factors

---

[18]As Justice Traynor once pointed out, "murder may be committed without a specific intent to take human life if the killing is committed under circumstances that show an abandoned and malignant heart." (*People* v. *Thomas* (1953) 41 Cal.2d 470, 479 [261 P.2d 1], conc. opn. of Traynor, J; see also *People* v. *Munn* (1884) 65 Cal. 211, 215 [3 P. 650]; *People* v. *Doyell* (1874) 48 Cal. 85, 95; *People* v. *Torres* (1949) 94 Cal.App.2d 146, 150 [210 P.2d 324]; *People* v. *Semone* (1934) 140 Cal.App. 318, 323-324 [35 P.2d 379]; *People* v. *Hubbard* (1923) 64 Cal.App. 27, 38 [220 P. 315].) Malice is inferred in such circumstances from indifference to fatal consequences that were or should have been anticipated. "If the known present state of things is such that the act done will very certainly cause death, and the probability is a matter of common knowledge, one who does the act, knowing the present state of things, is guilty of murder, and the law will not inquire whether he did actually foresee the consequences or not. The test of foresight is not what this very criminal foresaw, but what a man of reasonable prudence would have foreseen." (Holmes, The Common Law, *supra*, p. 45; see also Holmes' opinion in *Commonwealth* v. *Chance* (1899) 174 Mass. 245, 252 [54 N.E. 551, 554] ["reduced to its lowest terms, 'malice' in murder, means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act . . . ."])

[19]Originally, the term "abandoned and malignant heart" "did no more than phrase a comparison or alternative description of a conscious disregard of life." (*People* v. *Phillips* (1966) 64 Cal.2d 574, 588 [51 Cal.Rptr. 225, 414 P.2d 353], citing Comment, *Ambiguous Abandon and Murky Malignancy: Charging the Jury on Implied Malice* (1966) 114 U.Pa.L.Rev. 495, 497.

set forth in Penal Code sections 195, 196 and 197.[20] When it is said that voluntary manslaughter represents an intentional killing it is not meant that the actor intended to act unlawfully, for, as we have seen, he may have believed his act was legally justifiable or lacked the mental capacity to comprehend the duty imposed on him by law. The proof that the unlawfulness of voluntary manslaughter is not related to the intentional, i.e., the deliberate, nature of the act, as the majority supposes, is provided by the fact that the definition of manslaughter as an "unlawful killing" set forth in Penal Code section 192 refers not just to voluntary manslaughter but as well to involuntary manslaughter and vehicular manslaughter (Pen. Code, § 192), neither of which are intentional homicides. The fact that the mitigation which removes malice fails to eliminate the unlawfulness of the homicide seems to me both obvious and, for present purposes, meaningless, because the unlawful quality of the act does not shed much light on the actor's mental state.

Since it has been held (with the Attorney General conceding the point) that involuntary manslaughter does not necessarily involve moral turpitude within the meaning of *Castro* (*People* v. *Solis* (1985) 172 Cal.App.3d 877, 883 [218 Cal.Rptr. 469]), we know that the act of killing does not necessarily demonstrate a readiness to do evil simply because it is unlawful. We also know that a killing does not necessarily involve moral turpitude because it was intentional, because intentional killings may be justifiable. What we do not know, and what the majority does not and cannot satisfactorally explain, is why a killing should necessarily be considered "morally reprehensible" simply because it possesses in combination qualities which, when considered individually, do not necessarily indicate moral depravity of any kind, and are not intensified or otherwise transformed by virtue of being joined.

To say that a killing was both intentional and unlawful does not reveal the motive, purpose or design of the one who killed and therefore does not indicate the moral quality of the act. Assuming, as we must, that analysis is limited to the least adjudicated elements of the offense, the moral quality of the act can be evaluated only if it is known whether the intentional homicide was committed with or without malice; that is, whether it was murder or voluntary manslaughter. The conclusion that a killing necessarily involves moral turpitude simply because it was intentional and unlawful, and despite the fact it was without malice, leads to the conclusion that murder and voluntary manslaughter are morally indistinguishable. Such a conclusion cannot be reached without sheer indifference to some of the most venerable principles in the criminal law.

---

[20]With respect to the confusion that has arisen from the use of the word "unlawfully" in criminal statutes, see Williams, Criminal Law (2d ed. 1961) pages 27-29.

A man whose provoked killing of another is found to have been objectively reasonable in the circumstances, or who kills because of an honest though mistaken belief that otherwise he will die, or because, due to a mental defect, he cannot comprehend the duty not to kill, is guilty of a very serious felony offense and punished, but it cannot be said that he necessarily intended to do evil. Because the absence of malice may be seen as and is at least akin to the absence of "evil purpose," (see discussion, *ante,* at pp. 1116-1117) it seems to me it would be easier to argue that the least adjudicated elements of voluntary manslaughter necessarily *exclude* moral turpitude than to claim the opposite. But this is not my argument.[21] My position, as I have said, is merely that a homicide reduced to voluntary manslaughter will not always represent a morally depraved act that has any tendency in reason to reflect adversely on the credibility of the one who committed it. Since the least adjudicated elements of this offense do not necessarily involve moral turpitude within the meaning of *People* v. *Castro,* it cannot be used for impeachment purposes without violating the rule set forth in that case.

The conclusion that voluntary manslaughter necessarily involves moral turpitude does not represent a reasoned legal judgment about morals but a moral judgment. It is as morally unconvincing as it is legally unpersuasive.

The lead opinion in *Castro* suggests that some of the problems in determining whether a prior felony conviction involves moral turpitude and may be used to impeach may be ameliorated by reference to bodies of law regarding attorney discipline and the deportation of aliens, which also concern the characterization of felonies as involving or not involving moral turpitude. (*People* v. *Castro, supra,* 38 Cal.3d 301, 316, fn. 11.) After examining these two bodies of law and finding that they conflict on the question whether voluntary manslaughter involves moral turpitude, my colleagues not unexpectedly find "meaningful guidance" in the federal immigration cases, which are consistent with their view, and dismiss the attorney discipline cases, which are inconsistent.[22]

---

[21]I do not argue that the least adjudicated elements of voluntary manslaughter necessarily exclude moral turpitude because I do not think the concepts of malice aforethought and moral turpitude are precise enough to support so absolute a position. My colleagues are in this regard much more daring than I am.

[22]I do not think this can easily be done; because credibility—the central issue to which the moral turpitude standard of *Castro* is directed—seems much more critical to the question of fitness to practice law than to the question of citizenship. *In re Strick* (1983) 34 Cal.3d 891 [196 Cal.Rptr. 509, 671 P.2d 1251], establishes that violent felonies which are lesser offenses than first degree murder do not constitute moral turpitude per se. (*Id.,* at p. 902.) This is simply another way of saying that the least adjudicated elements of such offenses do not necessarily involve moral turpitude. It has also been established by our Supreme Court that the commission of a violent felony offense "in the heat of anger or as the result of

I do not think we should consult either body of law. First, as I have endeavored to demonstrate, there is ample basis within the criminal law upon which to determine whether the least adjudicated elements of voluntary manslaughter necessarily involve "a readiness to do evil." Secondly, the case law applying the moral turpitude standard in the noncriminal contexts of attorney discipline and deportation proceedings is not only contradictory but essentially incoherent. With respect to immigration cases, Justice Jackson has pointed out that "[w]hat is striking about the opinions in these 'moral turpitude' cases is the wearisome repetition of cliches attempting to define 'moral turpitude,' usually a quotation from Bouvier. But the guiding line seems to have no relation to the result reached. The chief impression from the cases is the caprice of the judgments. How many aliens have been deported who would not have been had some other judge heard their cases, and vice versa, we may only guess. That is not government by law." (*Jordan* v. *De George* (1951) 341 U.S. 223, 239-240 [95 L.Ed. 886, 896-897, 71 S.Ct. 703], dis. opn. of Jackson, J., fn. omitted, reh. den. 341 U.S. 956 [95 L.Ed. 1377, 71 S.Ct. 1011]; see also, Comment, *Constitutional Law: "Moral Turpitude"—A Treacherous Legislative Standard for Deportation* (1972) 40 U.R.K.C. L.Rev. 338.) The most recent scholarly study of the use of the "moral turpitude" or "moral character" standard with respect to professional licensing has similarly concluded that this standard is highly subjective and idiosyncratic, has not been applied consistently, and has "functioned primarily as a cultural showpiece." (Rhode, *Moral Character as a Professional Credential* (1985) 94 Yale L.J. 491, 493-494.)

The incorporation into the criminal law of the moral turpitude standard developed in these other legal areas will corrupt, not clarify, the criminal law of this State and ought to be resisted.

---

physical or mental infirmities does not, without more, cast discredit upon the prestige of the legal profession or interfere with the efficient administration of the law and should not be deemed to involve moral turpitude." (*In re Rothrock* (1940) 16 Cal.2d 449, 459 [106 P.2d 907, 131 A.L.R. 226].) If this be so, then how can the commission of such an offense, without more, necessarily show the depravity of one who may not be an attorney and used in a court of law to impeach his credibility?