Filed 6/23/14  P. v. Thompson CA3

<u>**NOT TO BE PUBLISHED**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

**(Sacramento)**

**----**

| | |
|---|---|
| THE PEOPLE, | C073272 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F01254) |
| v. | |
| ROBERT ALBERT THOMPSON, | |
| Defendant and Appellant. | |

A jury found defendant Robert Albert Thompson guilty of first degree murder, and further found that he personally used a knife during its commission.  The trial court sustained three recidivist allegations.  It sentenced him to state prison for a determinate term with a consecutive indeterminate life sentence.

On appeal, defendant contends the trial court committed prejudicial error when it allowed the impeachment of his credibility with two felony convictions (designated as unspecified "crimes of moral turpitude") and admitted various photographs.  We shall affirm the judgment.

1

# FACTUAL AND PROCEDURAL BACKGROUND

## A. Living Arrangements

Defendant lived with three women in an apartment on Bell Street. The group had an amicable, polyamorous sexual relationship; defendant was also openly involved in a sexual relationship with a fourth woman who visited the apartment, and with the victim as well, who lived in the Foothill Farms area west of Interstate 80.

Most of these women had nicknames, which we will employ. To the extent it is relevant to the jury's assessment of their credibility, we note that "Lala" admitted she was a prostitute and gave defendant all of her earnings. "Sena" bought items for the household, but did not otherwise provide defendant with any money. The third resident of the apartment—"Tia"—denied that she or Sena worked as prostitutes. (Defendant testified that Sena worked as a prostitute at some point after moving into the apartment, but Tia did not. "Karma"—the fourth woman—also agreed Tia did not work as a prostitute.) Karma started working as a prostitute after meeting defendant. Defendant had told Lala that victim Sharon King ("Kitty") was his sugar momma (indicating to Lala that Kitty provided money whenever he asked). According to defendant and Lala, Kitty never worked as a prostitute.

Lala testified that defendant had been physically abusive with her, and had also threatened to kill her and dispose of her body where no one would be able to find it. The four other women had seen defendant argue with Kitty about her drinking; Kitty in return argued about defendant's control of the use of her car. Lala also saw defendant beat Kitty before having sexual relations with her. Text messages on defendant's phone records indicated he and Kitty argued about his assertion of control over her money, and Kitty told him that she was going to leave him because he was verbally and physically abusive. Defendant admitted arguing with Kitty about her use of drugs, but denied ever hitting her.

2

### B. The Night in Question

On February 13, 2012, defendant dropped off Sena at her mother's house. He asked to borrow a gas can—assertedly to fill one of the household's cars that had run empty—that he took with him. Later that evening, defendant drove with Lala in Kitty's car to a gas station, where he filled two or three gas cans and put them in a duffle bag. He normally kept only one gas can in the trunk for when he would drive out of town. He told Lala they would all be driving out of town and he did not want to stop. After they got the gas, defendant and Lala went back to Kitty's house.

The ensemble was gathered there. Kitty was preparing food. Later in the evening, defendant announced to the five women that they were all going to go for a ride; Lala was under the impression they were going out to "work." They used Kitty's car; Lala was the driver. Before they left, defendant gave Sena a list of text messages he wanted her to send to Kitty's phone.

The testimony about the events thereafter diverges in the particulars. We do not need to detail the discrepancies, as these do not diminish the sufficiency of the evidence because it is for the jury to resolve which facts from which accounts to accept. (*People v. Love* (1960) 185 Cal.App.2d 604, 608; *People v. Holman* (1945) 72 Cal.App.2d 75, 89-90.)

Defendant told Lala to drive to the downtown Sacramento parole office on North B Street near the Loaves and Fishes facility and park in the lot (where they had slept in their car frequently before). Defendant got out of the car and said he would be right back. Kitty also got out of the car. He walked away with Kitty, after taking a plastic bag of clothing from Sena's lap that Kitty had packed and retrieving the duffle bag of gas cans from the trunk. Before leaving with Kitty, he told Lala he had changed his mind about them working; he directed her to drive to a nearby location in front of an apartment complex on Dos Rios Street near Richards Boulevard. As they waited, Sena sent the text

messages on defendant's list to Kitty's phone, after which Sena burned the sheet of paper as defendant had also directed. At some point, defendant called Sena and said he had taken care of a problem. Defendant called Lala on her cell phone and told her to meet him where he was walking; she drove to a parking lot of a Midas shop near 16th and D Streets.

Defendant was alone. According to Lala, he did not respond when asked about Kitty. Tia could recall only that he said something about Kitty being gone and not wanting to talk about the subject further; she did not recall him saying that Kitty was dead.[1] He was focused on the fact that the car battery was now dead, complaining that the women had run it down listening to the radio. Defendant was barefoot, and was not carrying either of the bags that he had taken with him. Karma thought he was wearing a different outfit. Defendant told Lala to text Kitty and let her know about the car problem. Everyone then slept in the car until the Midas shop opened, whose staff told them it would charge them for any assistance. After having the car towed, the group returned to their own apartment. When a TV news report mentioned police finding a body in Discovery Park set on fire, defendant said, "[Y]ou see that." He then told everyone that they were all taking a walk to meet someone for a ride.

Karma left. The others got a ride from Sena's mother, where they had access to another car. Defendant had Lala drive that car to Kitty's home, purportedly to pick her up. As they approached the residence, they saw police outside. Defendant told Lala to

---

[1] However, Tia told a detective that defendant had said Kitty was "gone" or "dead" and had also cautioned the women not to say anything about his returning to the car without Kitty. As for Karma, she testified that on his return defendant told them that Kitty had gotten angry and left, in a manner suggesting that this was an account with which they should agree. He also had emphasized to her, in particular, the importance of being part of a team, and his need for her to be supportive of him; if interviewed, she should say that she had not been with him, and that Kitty was out of town.

4

drive off; a short distance away, he told her to stop. He hopped out of the car, saying that he needed to handle something, and ran off. Lala drove to the freeway, at which point the police surrounded the car and detained the women for questioning.

## *C. Kitty's Fate*

A bicyclist riding to work in Natomas through Discovery Park at 3:30 a.m. on the morning of February 14 had observed through the fog a fire burning intensely in the distance as he crossed over the Jibboom Street Bridge. Another bicyclist crossed over the bridge at 6:00 a.m. on his way to work at the state college. A fire was burning vigorously to the north of the bicycle trail near the archery range. He called 911.

Police and firefighters found what they determined to be the badly disfigured charred remains of a woman. A black purse was nearby, which contained a driver's license belonging to the victim. It was readily apparent that gasoline was involved in the fire: The grass and leaves in the area were wet, yet the fire had burned down to the soil; there was a smell of gasoline in the area; and deep burn marks on the sides of the body were consistent with gasoline being poured on it. However, the pathologist determined that Kitty was "most likely" dead from a stab wound in the heart before the incineration of her body.

Police were in the process of searching Kitty's residence later that evening when they saw a car drive slowly up the alleyway toward her driveway. An officer who saw it recalled that it matched the description of a car associated with the victim. A neighbor shouted to the officer that this was a car of which he should take notice. The officer ran to his patrol car to follow. Losing sight of it, he broadcast a description. The police were able to detain it almost immediately on the freeway near Madison Avenue. Its three occupants were Lala, Sena, and Tia. They agreed to answer questions about Kitty (the police not letting them know at the time about finding the body).

### D. Defendant's Postarrest Behavior

In his interview with the police, defendant claimed he had left Kitty's home on February 13 around 9:00 p.m. with the others, and had not seen Kitty since then. She was not with them when the car broke down. He suggested she had "snuck" to Fresno after being intimate with another man. Defendant said that he and the other women had driven to the home of Sena's mom in South Sacramento. He was passed out in the back of the car on their way home after drinking too much, and the women woke him up when the car broke down. He first went to try to get help from his brother, who lived near Del Paso Boulevard and Arden Way, but no one was home. He came back to the car, and they all slept until the Midas shop opened. He also claimed it was Lala who wanted to leave after seeing the police at Kitty's home; she drove off without him after he got out to have a cigarette. When the detective told him that Kitty was dead, he expressed his surprise, then asked to talk to his probation officer before answering any further questions. He did not complain of being in any pain, and a booking photograph of him without his shirt on did not show any apparent injuries.

There was documentation of about 30 visits and phone calls with defendant while he was in jail awaiting trial. During one conversation, defendant said he got out of the car before the women were detained in order to go to the bathroom, but during another he said it was his probationary status that had motivated him to flee the car. He told both Sena and Tia that they should stay with a friend of his in Fresno to avoid testifying. He also counseled both of them to refuse to testify if called to trial, even if this would result in being held in contempt. He explained to them the importance of everyone sticking to the same story, and asked Sena to bring a pencil and paper to hold up to the window so that they could achieve this end without talking over the jail phones. He also expressed his frustration with Sena "messing with" his case, and directed her to heed his instructions.

6

### E. *Defendant's Account at Trial*

Defendant had contacted his probation officer in late January 2012 about obtaining shorter or more favorable terms of probation in exchange for providing information about large-scale narcotics operations to federal authorities. When everyone was at Kitty's on the night of February 13, he learned that she had arranged to meet a friend of his for a drug deal near Discovery Park in order to get extra money for them by transporting something out of town. He told Kitty about his negotiation with his probation officer, and suggested that he come along in order to gather information about his friend's operation that he could share with the probation officer as well. Kitty brought a bag of clothes because she intended to spend the night with defendant afterward.

When they parked the car, defendant took a duffle bag out of the trunk that had his sweatshirt in it. Kitty took out her bag of clothes in order to put it in her backpack. After extracting his sweatshirt, defendant threw his bag away when he found it had gotten some kind of fecal material on it from another bag. He initially confiscated Lala's and Sena's cell phones in case they were also involved in the drug deal, but then returned them. He and Kitty walked the two blocks up to Richards Boulevard, then headed down Richards past the freeway. They encountered the friend, who pointed a gun at defendant and told them to follow him. They walked over a bridge into Discovery Park near the archery range. Two people joined them here, both of whom defendant recognized.

Defendant's friend grabbed Kitty and jumped on top of her when she fell on her back. One of the other two men wrestled with defendant, injuring defendant's wrist as he pinned defendant to the ground on his stomach. The man released defendant. The friend walked defendant away from the area, telling him that he would take Kitty home and would clean up the scene. Defendant did not see Kitty move as he left. Defendant discarded his shoes after walking through some mud or manure. He did not tell the other women on his return what had happened to him in Discovery Park.

7

The manager of a downtown residential motel was a defense witness. He had been taking his morning walk through Old Sacramento at about 6:00 a.m. on February 14. He observed a man ranting angrily about killing someone and "his bitch." Having already heard about the Discovery Park incident, the manager took a picture of the angry man and gave it to the police.

Defendant identified the person in the manager's picture as his attacker. He had not said anything in his police interview about the attack because he was "preserving" that information to provide it to his probation officer for favorable treatment. He in fact had complained of the pain in his wrist during his interview, and his wrist was put in a cast while he was in jail.

## DISCUSSION

### I. Impeachment with the Two Felony Convictions Was Harmless

After trial counsel indicated defendant would be testifying, the prosecutor asserted her intent to impeach him with a number of prior convictions. Subject to any additional authority the parties might muster, the trial court ruled that the prosecutor could use four of the convictions for purposes of impeachment; at defense counsel's behest, the court directed the prosecutor to "sanitize" two of them (a 2007 conviction for sodomy while incarcerated, and a 2011 conviction for failure to register as a sex offender) by referring to them only as felonies "involving moral turpitude."

At the outset of his direct examination of defendant, counsel preemptively raised the issue of the prior convictions. Defendant acknowledged he had a conviction in 1998 for selling drugs, in 2001 for robbery, and in 2007 and 2011 for felonies involving moral turpitude. The prosecutor nonetheless reiterated these points in her cross-examination of defendant (managing to confuse the nature of the prior convictions).

8

Defendant contends sodomy while incarcerated and failure to register as a sex offender are not crimes involving minimum statutory elements that reflect a " 'readiness to do evil' " (either as a matter of demonstrating dishonesty or "moral depravity") as required in the definition of moral turpitude applying to impeachable felony convictions (which is based on the limitations of due process to *relevant* convictions). (*People v. Castro* (1985) 38 Cal.3d 301, 314-317.)[2] The People concede the point, but assert the error was not prejudicial. As we agree with the latter premise, because we do not find even the possibility of a more favorable outcome for defendant if these additional convictions were not before the jury (*id.* at p. 319; *People v. Forster* (1985) 169 Cal.App.3d 519, 525-526 [cases "unanimous" that this is proper standard of prejudice]),[3] we do not express any opinion on the merits of defendant's claim. (As a result, we do not need to consider his arguably "lurking" additional claim (*Imagistics Internat.*, *Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593, fn. 10; *Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 202) that the trial court erred in imposing the burden on him to find a basis for exclusion of the impeachment evidence).

Defendant properly notes that evidence may be *excluded* as cumulative. (*People v. Burgener* (1986) 41 Cal.3d 505, 525.) However, the *admission* of cumulative evidence is not generally prejudicial. (*People v. Arias* (1996) 13 Cal.4th 92, 153; *Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2009) 176 Cal.App.4th 1249, 1254-1255 [admission or rejection of evidence not a miscarriage of justice where cumulative]; 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 430, p. 485.) Defendant fails to show any exceptional circumstance in the present case that

---

[2] A narrower definition applies in the context of professional discipline. (*People v. Coad* (1986) 181 Cal.App.3d 1094, 1105-1106.)

[3] We consequently reject defendant's assertion that any error must be harmless beyond a reasonable doubt. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

would take it outside this principle, particularly where this cumulative impeachment was in sanitized form. We thus reject the claim of prejudicial error. We do not find persuasive defendant's invocation of a decision of the late Justice Bernard Jefferson, who criticized the presumption that jurors heed admonitions (in the context of admission of other crimes evidence) as being "an exercise in futility and illusory imagery." (*People v. Gibson* (1976) 56 Cal.App.3d 119, 130.) As noted in a later case, this rhetoric does not have any weight in the absence of affirmative evidence that a jury disregarded limiting instructions. (*People v. Zack* (1986) 184 Cal.App.3d 409, 416.)

## II. Admission of Photographic Exhibits Was Proper or Harmless

Defendant challenges the admission of several autopsy photographs, his booking photograph, and two screenshots from his social media account (conceding two other screenshots are not prejudicial). Of the exhibits he challenges on appeal, he did not object to exhibits 45 or 53 in the trial court, so his argument is forfeited as to them. (Evid. Code, § 353.) He also does not renew his objection to exhibit 46.

With regard to defendant's objections to the autopsy photographs in exhibits 39, 44, 49, 50, 52, and 135, the trial court overruled them, concluding the subject matter was not unnecessarily unpleasant, and was relevant for corroborating the testimony of the pathologist and the detective who had described the condition of Kitty's body. As for the booking photo (exh. 140) and the first of the screenshots (exh. 144), defendant objected that these constituted "gang evidence," as the booking photo revealed tattoos (including "666") and the screenshot showed him wearing a red bandana and red T-shirt; he did not explain his objection to the second screenshot (exh. 147) that showed him brandishing gambling winnings. The trial court overruled the objections, ruling that the exhibits related to defendant's testimony.

## A. *Autopsy Photographs*

Defendant cites *People v. Marsh* (1985) 175 Cal.App.3d 987, 998 (*Marsh*), which held the admission of autopsy photographs of the victim's exposed brain was error because they were merely cumulative of the pathologist's testimony and the cause of death was not in dispute, even though they were relevant to the issue of the amount of force used. He fails to mention that the court also found that this error was nonetheless harmless because the testimony of the medical experts unequivocally refuted defendant's claim of accident, and other photographs that were admitted without objection were equally inflammatory. (*Id.* at pp. 998-999.)

"Gruesome or not, admission of relevant autopsy photographs is in the sound discretion of the trial court, even where they are only cumulatively used to graphically portray injuries already detailed in the testimony of a doctor witness." (*Marsh*, *supra*, 175 Cal.App.3d at p. 998.) While the manner of disposal of the body was irrelevant for the most part, there is *some* probative value in photographs of the victim's charred remains. That the manner of disposal was incineration inferentially connects the gas-can-carrying defendant with the victim's demise, and the photographs corroborate the pathologist's testimony (even though the issue of incineration was not in dispute and other witnesses established the conflagration that had taken place at the site). By the same token, however, these photographs are not especially prejudicial in light of the evidence of the stabbing of the victim through the heart (the cause of death reflected in the testimony of the pathologist and graphically corroborated in exh. 53). In addition, there was strong circumstantial evidence of defendant's guilt (regardless of his account attempting to ascribe the victim's demise to the agency of third parties), as she disappeared after walking off in his company while he carried gasoline away from the car, and defendant's conduct thereafter reflected a consciousness of guilt. We thus do not find any reasonable possibility that excluding these photographs would have resulted in a more favorable outcome for defendant.

11

Exhibits 49, 50 and 52, on the other hand, illustrate the pathologist's testimony on the issue of the cause of death. As a result, they are relevant, and the trial court did not abuse its discretion in concluding any prejudice did not outweigh this probative value; one can barely discern that the subject of the photographs (showing the heart in the chest cavity) is a human body, and they are less gruesome (again) than the picture in exhibit 53 showing the heart in isolation after its removal from the body.

### B. Photographs of Defendant

Defendant's booking photograph in exhibit 140 is relevant on the issue of his veracity to the extent it contradicts his claim of being wrestled to the ground, because he does not have any visible injuries. It is true this might nonetheless be consistent with his testimony, but the prosecution was entitled to rely on it to argue to the contrary. It was therefore not an abuse of discretion for the trial court to conclude that the mere fact it shows defendant's torso tattoos (including "666"), none of which have any express gang references, was not sufficiently prejudicial to outweigh this probative value.

As for the other two pictures of defendant, while they may have corroborated facts in his testimony, these facts are not relevant to his guilt or innocence and the admission of the exhibits was arguably an abuse of discretion. However, we again do not believe it is reasonably probable that the exclusion of these exhibits would have resulted in a more favorable outcome to defendant. His display of cash is innocuous, and his wearing a red bandana and T-shirt does not of itself suggest gang indicia. Consequently, neither of the photographs presents the possibility that the jury may have found him guilty for reasons other than the strong circumstantial evidence of his commission of the murder.

## DISPOSITION

The judgment is affirmed.


       BUTZ       , Acting P. J.


We concur:


      DUARTE     , J.


      HOCH      , J.