Filed 2/2/15  P. v. Martinez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>      v.<br><br>DAVID ARTHUR MARTINEZ,<br><br>   Defendant and Appellant. | G049337<br><br>(Super. Ct. No. 12ZF0158)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

David Arthur Martinez appeals from the judgment following his conviction on a count of conspiracy to commit murder (Pen. Code, § 182, subd. (a)(1); all further statutory references are to this code) and a count of gang participation (§ 186.22, subd.(a)). A gang enhancement was also alleged, and found to be true, as to the conspiracy count. Martinez was sentenced to 25 years to life on the conspiracy count, with a minimum of 15 years to be served in accordance with section 186.22, subdivision (b)(5), and the trial court stayed an additional two-year term on the gang participation count in accordance with section 654.

Martinez argues the judgment must be reversed because (1) the conviction on the count of conspiracy to commit murder was based on the uncorroborated testimony of an accomplice, (2) the jury was instructed to presume the truthfulness of statements made by the accomplice prior to trial, and (3) the prosecutor committed misconduct by misstating the law, commenting on Martinez's potential penalty and trivializing the seriousness of the jury's task. We find none of these arguments persuasive, and affirm the judgment.

Section 1111, which imposes the requirement that accomplice testimony be corroborated, requires corroboration of the defendant's *connection to the conspiracy*, but not of the existence of that conspiracy. Here, Martinez's connection to the conspiracy was amply corroborated by evidence independent of the accomplice's testimony, and thus the evidence was sufficient to support his conviction.

Martinez's claim of instructional error fails because CALCRIM No. 318, the instruction he challenges, imposes no *presumption* that statements made by a witness prior to trial are truthful. Instead, it merely allows (rather than urges) the jury to draw that conclusion for itself.

And finally, the prosecutor's alleged misconduct is a chimera. The prosecutor did nothing other than respond to defense counsel's implication that the jury's responsibility in assessing guilt was *especially* serious in this case, because the charged

2

crime was so significant. By reminding the jury that the seriousness of its task did not hinge on the seriousness of the crime, the prosecutor did not "trivialize" that task. Nor did he improperly comment on penalty or misstate the law in any significant way.

FACTS

At about 11:00 p.m., on a Friday night, officers from the Santa Ana Police Department were staking out a neighborhood claimed by the West Myrtle Street gang, an area which had experienced several shootings – including one resulting in a death – within the prior six months. Four of the officers were secluded in shadowy courtyard areas of apartment buildings located on West Myrtle Street. After a quiet period with no traffic, the officers saw a white Chevrolet Lumina turning slowly onto West Myrtle. The car's windows were down and several occupants were inside.

The car paused for several seconds in front of each building's courtyard, before finally stopping to let three young men get out. Those men then walked alongside the Lumina, continuing to look toward the apartment buildings, while the car continued its slow progress down the street. The young men then got back into the car, which turned up another side street.

A few minutes later, the Lumina again appeared on West Myrtle, before turning onto a side street and stopping at a curb. Once again, three young men got out of the car and walked to Myrtle. At that point, one of the officers recognized all three of those men, one of whom was Martinez. They appeared to be looking around, and returned to the car after about 30 seconds or a minute.

After those men reentered the Lumina, it drove away but then returned a few seconds later to cruise West Myrtle again before driving away once more. Shortly thereafter, another Santa Ana police officer stopped the Lumina about four blocks away. After the car stopped, one of the occupants opened its right front door, jumped out, and

3

then ran away with what appeared to be a handgun in his hand. He jumped a fence onto the property of a taqueria, where he tossed the gun onto the roof and kept running. He was later apprehended in the restroom of the taqueria, and the gun was retrieved from the roof.

There were still six other occupants in the Lumina, including the driver, Martinez, Martinez's brother, and a young man named Eric Beltran who would subsequently testify against Martinez at trial.

Beltran was interrogated by police a few days later. He claimed that everyone in the car, other than Martinez, was a member of the Los Compadres gang. Beltran stated the original plan that evening was to go to a party, and someone suggested they pick up a "toy" – slang for gun – to use in case they ran into trouble. They drove to a house, where one of the other young men went inside briefly and then returned to the car saying, "[L]et's go." According to Beltran, at that point everyone in the car knew that he had a gun.

Beltran stated that after they left that house, one of the car's occupants said, "[L]et's get a turtle" – "turtle" being the slang term for a member of the West Myrtle gang, and "get" meaning to kill. They then proceeded to the West Myrtle neighborhood. Beltran admitted that when a group of gang members enter a rival gang's territory with a gun, the goal is "[t]o shoot someone."

Martinez was tried jointly with several of his codefendants. The transcript of Beltran's interrogation was introduced into evidence at that trial.

When Beltran testified at trial, he acknowledged he had entered into an agreement with the prosecutor that would allow him to go free if he testified truthfully, but he then told a substantially different story than the one he had previously related to the police. Beltran first testified he was not a member of Los Compadres, and did not know anyone who claimed to be, asserting he had been pressured to say otherwise by police. But he then conceded that was a lie, and admitted that he had claimed Los

4

Compadres since he was 14 or 15 years old. Beltran identified the West Myrtle gang as one of the primary rivals of Los Compadres, and explained that entering rival gang territory is a way to gain respect within the gang, and actually killing a rival is the ultimate way to gain respect.

Beltran also contradicted his earlier statements to police about the group's intentions on the night they were arrested. Although he admitted having told police that rolling up with six other gang members into rival territory, with a gun, demonstrates the intention to shoot someone; i.e., to "murder" them, he claimed at trial that the group was just looking to "have a little excitement," not to shoot anyone, when they cruised slowly through West Myrtle territory. Beltran claimed he was personally unaware that anyone in the car even had a gun, but explained that if there were one, it would have been intended solely for protection, because they had no intention of shooting anyone. Beltran stated he had been in a car or with another person who had a gun on many occasions, but those guns were hardly ever used.

The prosecution also introduced the testimony of various Santa Ana police officers, who indentified Martinez and his cohorts as Los Compadres gang members, and explained that Martinez, along with others, had been previously served with notices under the California Street Terrorism Enforcement and Prevention Act (§ 186.22). Further, Martinez had previously identified himself as a member of the gang.

One of the police officers testified as a gang expert, and he explained how important guns are within gang culture, and why a gang member holding a gun would never hide that fact from his fellow gang members – to do so would be a sign of disrespect. The expert also stated that Hispanic gangs like Los Compadres and West Myrtle, are "turf-oriented" and that entering the turf of a rival gang is considered a sign of disrespect. He also confirmed that the area where Martinez and his fellow gang members were cruising on the night they were arrested was West Myrtle territory. When presented with a hypothetical based on the facts of this case, the expert opined that the

5

group's decision to cruise through West Myrtle territory with a gun was a "classic" gang crime designed to show disrespect for West Myrtle and generate respect for their own gang, and if one of the group members had openly expressed a plan to "smoke a turtle," that would show the group's intention was to commit a murder.

*1. The Evidence was Sufficient to Support the Conviction for Conspiracy to Commit Murder.*

Martinez's first argument is that his conviction for conspiracy to commit murder must be reversed, because it was based on the uncorroborated testimony of Beltran, his alleged accomplice in that conspiracy. Martinez contends that apart from Beltran's statements, the only evidence against him is that he was among a group of gang members that drove slowly through rival gang West Myrtle's territory with a gun in the car, looking into courtyards, and that he and others periodically got out of the car and walked alongside the car while appearing to look for something or someone. In Martinez' view, this evidence "did not connect [him] with the charged crime of conspiracy to commit murder" – only Beltran's statement does that.

We disagree. As Martinez implicitly (and correctly) acknowledges, section 1111 does not require corroboration of accomplice testimony about the crime itself, but instead requires corroboration of the *defendant's connection* with that crime. Thus, section 1111 provides in pertinent part that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence *as shall tend to connect the defendant with the commission of the offense*; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (Italics added.) With respect to the crime of conspiracy specifically, "[t]he testimony of an accomplice is sufficient to establish the fact or existence of a conspiracy (the corpus delicti); his or her testimony needs corroboration only as to the defendant's connection with it." (*People v. Cooks* (1983) 141 Cal.App.3d 224, 312.)

6

The flaw in Martinez's argument is that he conflates the evidence which establishes the crime committed (the conspiracy to commit a murder, which Beltran admitted in his statements to police) with the evidence establishing *Martinez's own connection* to it.

The essence of a criminal conspiracy is the agreement: "A criminal conspiracy exists where there is an unlawful agreement between two or more people to commit a crime and an overt act in furtherance of the agreement." (*People v. Williams* (2013) 218 Cal.App.4th 1038, 1063.) "'Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.' [Citations.] . . . 'Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes.'" (*People v. Johnson* (2013) 57 Cal.4th 250, 258-259.)

"To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.'" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025.) Thus, "the conspiracy complained of may oftentimes be inferred from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the act, and generally all of the circumstances preceding and attending the culmination of the claimed conspiracy." (*Siemon v. Finkle* (1923) 190 Cal. 611, 615-616, abrogated on another point in *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1208-1212.)

Here, while there is ample circumstantial evidence that the occupants of the Lumina were engaged in some sort of coordinated plan when they chose to cruise through West Myrtle on the night they were arrested – and the fact they also obtained a gun before embarking on this venture suggests the goal of the agreement was criminal in nature – there is at least an argument to be made that in the absence of Beltran's statements to the police, the jury could not know the precise goal of that conspiracy.

7

Beltran's statements to the police supplied that link, specifying that the goal of this conspiracy was to commit a murder.

But because Beltran's identification of the criminal purpose underlying the agreement does nothing more than "establish the fact or existence of a conspiracy (the corpus delicti)" (*People v. Cooks, supra*, 141 Cal.App.3d at p. 312) it required no corroboration. Thus, that aspect of the crime could be established by Beltran's testimony alone. It is only Martinez's *connection with* that established conspiracy which must be independently corroborated in accordance with section 1111. (*People v. Cooks*, *supra*, 141 Cal.App.3d at p. 312.) He could not have been criminally responsible for participating in this conspiracy merely because Beltran *claimed* he had been involved.

And he was not. Instead, Martinez's *connection to* the conspiracy Beltran described was established by Martinez's active participation in both the Los Compadres gang and the series of events described by the police officers. We know from this other evidence that he was in the car with Beltran and the others – and a gun – cruising the territory of a rival gang. We know he personally got out of the car at one point with two of the others, and they walked alongside the slowly moving car while appearing to look for someone. And he then got back into the car, which certainly suggests he was not making any effort to distance himself from the group's plan.

That corroborating evidence is more than sufficient to link Martinez to the conspiracy described by Beltran, and was entirely consistent with what Beltran originally admitted was the group's plan to commit a murder. This corroborating evidence was more than sufficient to satisfy the requirements of section 1111.

*2. The Jury Instructions Impose no Improper Presumption.*

Martinez next asserts his convictions must be reversed because the instructions given to the jury incorporated an "irrational presumption" that the initial statements made by Beltran to the police were true, just because he made them. Martinez

8

points specifically to CALCRIM No. 318, which states: "You have heard evidence of the statements that a witness made before trial. If you decide that the witness made those statements, you may use those statements in two ways: 1. To evaluate whether the witness's testimony in court is believable; [¶] AND [¶] 2. As evidence that the information in those earlier statements is true."

Martinez's argument appears to be that because the instruction told the jury that once it determined Beltran made the out-of-court statements, it could treat those statements as evidence that the information he relayed was true, it created a presumption that the statements were true.

We reject Martinez's assertion for the very basic reason that we can discern no such *presumption* in the instruction. The instruction's use of the word "may" merely allows, but does not require, the jury to treat whatever statements it concluded Beltran made, as credible and accurate. "The ordinary meaning of 'shall' . . . is of mandatory effect, while the ordinary meaning of 'may' is purely permissive in character" (*Larson v. State Personnel Bd.* (1994) 28 Cal.App.4th 265, 276). We know of no cases that even suggest that CALCRIM No. 318 might create such a presumption, and while Martinez cites two cases which he believes erroneously approve the instruction (*People v. Hudson* (2009) 175 Cal.App.4th 1025; *People v. Tuggles* (2009) 179 Cal.App.4th 339), only *Hudson* even alludes to this specific issue, noting that while the appellant had made such a presumption claim in his opening brief, he withdrew it in his reply: "In his opening brief, defendant asserts that 'the instruction effectively tells the jury [that] once they decide the witness made an out-of-court statement, the statement itself is evidence the statement is true!' In his reply, however, defendant acknowledges that 'CALCRIM [No.] 318 does not issue a mandate on how the evidence is used.'" (*People v. Hudson, supra*, 175 Cal.App.4th at pp. 1027-1028.) The *Hudson* court nonetheless addressed the claim briefly, noting (as we have) that the instruction's use of the word "may" means it "does

9

not require the jury to credit the earlier statements even while allowing it to do so." (*Id.* at p. 1028.)

In any event, any potential concern that CALCRIM No. 318 implies that a witness's prior statements are automatically imbued with special credibility is addressed by the well-settled rule that all jury instructions must be read and understood in the context of other instructions. "''"[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'''" (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) In this case, that means CALCRIM No. 318 must be read in conjunction with both CALCRIM No. 226, which told the jury that "[y]ou alone must judge the credibility or believability of the witnesses," and CALCRIM No. 302, which told the jury that "[i]f you determine there is a conflict in the evidence, *you must decide* what evidence, if any, to believe." (Italics added.) Given that we must also "'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given'" (*People v. Richardson, supra*, 43 Cal.4th at p. 1028), we conclude these additional instructions would have been sufficient to dispel any possible implication that CALCRIM No. 318 required the jury to presume that *whatever* statements Beltran made to the police prior to trial would have been true.

*3. The Prosecutor's Arguments Were not Improper.*

Martinez's final assertion is that the prosecutor engaged in misconduct when he "trivialized the jury's responsibility" improperly "commented on penalty," and "misrepresented the law" relating to sentencing. The Attorney General contends Martinez waived this assertion when his defense counsel failed to object at trial, pointing out the failure to timely object and request an admonition is excusable only if doing either would have been futile. (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.) Martinez has made no such showing in this case.

10

However, because Martinez also asserts that any waiver of these objections must be considered as constituting ineffective assistance of counsel, we shall address them on the merits for the sake of efficiency. (*People v. Williams* (2000) 78 Cal.App.4th 1118, 1126 [court addresses issue waived by appellant's failure to object "to forestall a petition for writ of habeas corpus based on a claim of ineffectual counsel"].) We find none of these assertions persuasive.

As Martinez acknowledges, the prosecutor's challenged statements came in rebuttal to something defense counsel said at the end of his closing argument. Defense counsel concluded his argument by reminding the jury that the charge of conspiracy to commit murder was "a serious thing to convict these guys of. Be careful." The prosecutor responded to that statement by telling the jury that the seriousness of the charge is not something the jury should consider in reaching its decision. He reminded the jurors that "the law Judge Paer just read to you says you can't consider the seriousness of the charge and you cannot consider the seriousness of your verdict and the impact it may have on the defendants' family members or the defendants and there are subtle ways to do things about discussing a case in argument to suggest that it is a serious thing to convict these guys of. [¶] Judge Paer, if you find a guilty verdict, will weigh factors of mitigation, factors of aggravation, look at prior history. He and only he makes the determination of what the appropriate punishment is in this case, and you have to trust that Judge Paer will follow the law, as we are trusting you to follow the law in coming up with an appropriate disposition."

In Martinez's view, the portion of the prosecutor's statement telling the jury that should not consider the seriousness of the charge in reaching its decision was improper because "the jury's task is a 'serious' one" (quoting *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1267), and it is "[t]he 'solemn responsibility of each and every juror to protect the integrity of our criminal justice system.'" (Quoting *People v. Coad* (1986) 181 Cal.App.3d 1094, 1110.) Thus, Martinez believes the prosecutor's

11

comments trivialized the jury's responsibility by falsely claiming it "could not consider the seriousness of its responsibility."

We cannot agree because the prosecutor's argument never suggested the jury should not consider the seriousness *of its own responsibility*. Instead, the prosecutor's point was that, contrary to defense counsel's potential implication, the significance of the jury's responsibility was not *further enhanced* by the seriousness of the charge before it. Stated another way, there is no *heightened* certainty required of a jury which is deciding a very serious charge. Instead, *all juries* must be equally careful in deciding the issues placed before them. The prosecutor did not err by making that point.

Martinez also claims the prosecutor's statements improperly commented on penalty, and then compounded that error by misstating the law applicable to punishment in this case. As Martinez points out, "[a] defendant's potential punishment is not a proper matter for jury consideration." We agree. However, that is the very point the prosecutor made in reminding the jury that "you can't consider the seriousness of the charge and you cannot consider the seriousness of your verdict and the impact it may have on . . . the defendants'." The prosecutor does not err by reminding the jury that it cannot consider what it cannot consider.

As for Martinez's contention the prosecutor misstated the law, this is based on the prosecutor's statement that the trial judge would "weigh factors of mitigation, factors of aggravation, look at prior history [and that] he makes the determination of what the appropriate punishment is in this case." Martinez points out this statement is misleading because the judge actually would have no discretion to consider these factors in assessing punishment on a charge of conspiracy to commit murder. Instead, the mandatory sentence would be 25 years to life.

While we agree the prosecutor's description of the court's sentencing role was inaccurate as applied to the conspiracy count, we agree with the Attorney General that any inaccuracy was not material. As the Attorney General points out, the thrust of the prosecutor's argument was simply "to shift the jury's focus *away from any consideration of punishment*." (Italics added.) This overarching theme was summarized in the prosecutor's statement that only the judge is responsible for considering punishment, and the jury must "trust that Judge Paer will follow the law, as we are trusting you to follow the law . . . ." This was an appropriate message.

Martinez nonetheless contends the prosecutor's comments were likely prejudicial because just "[a]s jurors are more likely to acquit if they know the punishment is severe . . ., it stands to reason that [the jury] would be more likely to convict if they believe *there is a possibility of a lenient sentence*." (Italics added.) His conclusion does not follow from the premise. In contrast to a situation where the jurors "*know* the punishment is severe" (italics added), the mere *possibility* of a lenient sentence due to mitigating factors *also* implies the possibility of a *severe* sentence due to aggravating factors. It provides the jury with no potentially prejudicial *knowledge* of what the sentence will actually be. Consequently, there is no basis to conclude the prosecutor's description of how the court would mete out a sentence, even if technically inaccurate, would likely have prejudiced the jury's deliberations.

DISPOSITION

The judgment is affirmed.

RYLAARSDAM, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

14